# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT NASHVILLE
_____

| | | |
|---|---|---|
| INA KATHERINE WARREN and husband, KARL STANLEY DAVIDSON, | ) ) ) | Davidson County Circuit Court No. 90C-3564 |
| | ) | |
| Plaintiffs/Appellants | ) | |
| | ) | |
| VS. | ) | C. A. NO. 01A01-9606-CV-00277 |
| | ) | |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, | ) ) ) | |
| | ) | |
| Defendant/Appellee | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| THE METROPOLITAN NASHVILLE EDUCATION ASSOCIATION, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<div style="border:1px solid black; text-align:center">

# FILED

**April 11, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

</div>

_____

From the Circuit Court of Davidson County at Nashville.
**Honorable Thomas W. Brothers, Judge**

**David Randolph Smith**, Nashville, Tennessee
**Joseph H. Johnson**, Nashville, Tennessee
Attorneys for Plaintiffs/Appellants.

**James L. Murphy, III, Director of Law**, Nashville, Tennessee
**William Michael Safley, Metropolitan Attorney**, Nashville, Tennessee
Attorneys for Defendant/Appellee Metropolitan Government of Nashville and Davidson County, Tennessee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J.,W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

This action stems from most unfortunate circumstances involving a physical assault upon a teacher by a fifteen year old student (hereinafter referred to as "Student"). The incident occurred on December 4, 1989 when Appellant, Ina Katherine Warren, intervened in a fight between two students, at West End Middle School, where she was employed as a guidance counselor. During her attempt to break up the fight Student struck Warren in the face causing permanent head injury. Warren, as an employee of the Metropolitan Public School System, filed suit against various defendants, including the appellee, Metropolitan Government of Nashville and Davidson County (Metro), alleging negligence, a violation of her civil rights, assault and battery and a third party beneficiary claim for breach of contract.[1] The trial court dismissed all theories of recovery as to Metro except the claim for breach of contract. Metro filed a motion for summary judgment as to the remaining theory which was granted by the trial court. Appellants assert on appeal that the trial court's summary disposition of their claim for breach of contract was error. Upon review of the record, we conclude that the trial court was correct in its decision and affirm.

The record establishes that at the time of the assault, Mrs. Warren was 46 years old and had been employed by the Metro school system for approximately eighteen years. Student initially enrolled at West End in the 1989-90 school year. Previously, he attended another junior high, W. A. Bass Middle School. He was suspended there, however, prior to the completion of the 1987-88 school year for its remainder due to violation of school policy. He reentered Bass in the fall (1988-89) but was again suspended in November 1988 for "[t]hrowing a brick and breaking a window . . . in a house on his way home from school and repeated violations of school rules." After a disciplinary hearing or "staffing," the school recommended that Student be excluded from any Metro school for the remaining school year, with the exception of attending the Alternative Learning Center, and that he be transferred to another school upon reentry. Student was staffed and

---

[1]Warren's husband, Karl Stanley Davidson, filed a claim for loss of consortium and is an appellant in this appeal. The lawsuit as to Jim Wells, Juvenile Court Probation Officer, the Metropolitan Board of Education of Nashville and Davidson County, and the two students was voluntarily dismissed. The suit as to Metropolitan Nashville Education Association (MNEA) was dismissed, upon motion, by the trial court. Although the appellants have appealed from this ruling and have designated MNEA as an appellee in their brief, MNEA has not filed a brief with this Court. Therefore, for purposes of this opinion, all references to the "appellee" pertain to Metro. The record also shows that defendants State of Tennessee and State of Tennessee Department of Youth Development moved to dismiss the action as to them. The record does not reflect a ruling thereon. However, the judgment of the trial court was rendered final as to Metro in accordance with Rule 54.02 T.R.C.P. and is properly before us.

subsequently assigned by Metropolitan Public Schools to West End "on strict probation."

At the time of his arrival at West End, Student had a history of criminal activity and a propensity for violence, including hitting a fellow female student in the face, shoplifting, burglary into Bass Middle School (for which a police report was filed and charges brought), malicious destruction of property and receiving and concealing stolen property.[2] In addition, just weeks before the attack on Warren, the principal of Bass Middle School, James Turbeville, reported Student to the Metropolitan Police Department for criminal trespass at the school on November 22, 1989. It is not disputed that Turbeville did not inform West End's principal, Paul Mays, of the incident.

Appellants' complaint, as amended, asserts that Warren's injuries were the result of Metro's breach of its "Educational Agreement 1989-1990" (Agreement) with the MNEA, of which Warren is a member. It is alleged that the Agreement was executed for the express benefit of professional personnel employed by Metro and, thus, makes Warren a third party beneficiary of the contract. Appellants allege that Metro specifically breached the agreement by: failing to advise Warren of the histories of criminal misconduct or propensities for violence of certain students, thus creating a highly dangerous working environment; failing to provide specific training to faculty and staff to handle student fights; and/or failing to provide trained security personnel to assist the faculty and staff in maintaining discipline. The complaint was further amended to allege a breach by Metro due to Principal Turbeville's failure to warn Principal Mays of Student's two alleged break-ins at Bass so that Student could have been disciplined in accordance with school policy as set forth in the Agreement and in the Student Code of Conduct. Appellants allege that the latter was incorporated by reference and necessity into the Agreement and is "an integral part" of the contract. It was also alleged that Metro's failure to take appropriate disciplinary action in response to Student's criminal activities and violations of school policy constituted a breach.[3] Appellants assert that Student's

_____

[2]The record reflects that Student was followed by a juvenile probation officer and was on legal probation.

[3]The "known criminal acts" for which Metro allegedly failed to properly discipline Student were cited as an April 1989 incident (breaking and entering at Bass school), November 16, 1989 incident (assault on female student), November 17, 1989 (burglary/forced entry) and a November 22, 1989 incident (criminal trespass at Bass). It was also alleged that Metro failed to properly discipline Student for repeated violation of school disciplinary rules, 9 office referrals to be exact, in the fall semester of 1989.

"violent behavior" coupled with the fact "of his strict probationary status at [West End], required Metro to suspend this student and seek further staffing for his removal from the school system."

The trial court entered a summary judgment for Metro upon determining the following:

> [T]he Court determined that there is no genuine issue of material fact and that the Defendant is entitled to a judgment as a matter of law. Specifically, the Court determined that the Defendant was entitled to dismissal of this Complaint based upon the grounds that the Education Agreement and the facts of this case do not support a breach of contract claim; the Plaintiffs' damages are too remote, unforeseeable, and uncertain to reasonably have been within the contemplation of the parties to the Agreement; and applicable state law prevents Plaintiffs from maintaining this action under a breach of contract theory. The Court further determined that dismissal of the breach of contract claim warrants dismissal of Plaintiff Davidson's loss of consortium claim.

Appellants raise the following issues for review:

> 1. Whether the Educational Agreement in question creates certain duties on the part of defendant Metropolitan Government owed to plaintiff Warren to do one or more of the following:
> A. To discipline minor defendant [Student] for his criminal misconduct prior to December 4, 1989;
> B. To warn Plaintiff of [Student's] past criminal activity;
> C. To train Plaintiff to intervene in student fights; and/or
> D. To provide trained security personnel on school premises.
>
> 2. Whether Plaintiffs' injuries resulting from the breach of contract by defendant Metropolitan Government were foreseeable and certain so as to have been within the contemplation of the parties to the contract.
>
> 3. Whether Plaintiffs' cause of action against defendant Metropolitan Government for breach of contract is proper under applicable state law.[4]

Resolution of our first issue naturally entails a proper interpretation of the Agreement.

---

[4]We note that Appellants have also raised issues regarding Warren's contractual status and the exhaustion of administrative remedies doctrine. Appellee concedes that, for purposes of summary judgment, Warren is a third party beneficiary of the Agreement and that the latter issue is moot. Consequently, these issues will not be considered on appeal.

It is contended that Metro's failure to appropriately discipline Student for his prior criminal misconduct, to warn Warren of his past criminal activity, to train Warren in proper intervention of student fights and/or to provide trained security personnel constitutes a breach of the following provisions of the Agreement:

I. STUDENT DISCIPLINE

1. System-wide discipline regulations shall be published and made known. The Administration shall clearly indicate the intent of the Board to enforce these regulations and maintain an orderly learning environment in the schools. Teachers enforcing these regulations will have the support of the Board and Administration. The behavior of students will be in conformance with system-wide regulations. Failure to conform shall subject a student to disciplinary action.

2. The Board recognizes that effective classroom teaching is dependent upon teacher management of the classroom and the absence of disruptive behavior on the part of the students. The Board hereby assures teachers that it will give support and assistance to teachers with respect to the maintenance of control and discipline in the school within the framework of Board Policy.

3. Whenever it appears that a particular pupil requires the attention of special counselors, social workers, law enforcement personnel, physicians, or other professional personnel, the Administration will take positive steps to assist the teacher.

. . . .

5. Individual records on student discipline will be made available to teachers concerned as an aid for determining disciplinary recommendations concerning particular pupils.

6. The Association recognizes the teacher's responsibility to maintain discipline and a climate for good instruction in the classroom through effective teaching and leadership techniques and through application of appropriate classroom management procedures in accordance with the policies and regulations of the Board. The Administration recognizes its responsibility to support teachers in all reasonable disciplinary measures in accordance with the policies and regulations of the Board.

In addition, Appellants rely upon the "Student Conduct" manual which provides, as pertinent here:

**PART I**
**Code of Student Conduct**
A. Introduction

. . . .

. . . . Disciplinary action for violation of the rules of the school community may be taken by the school regardless of whether criminal or civil charges result.

. . . .

The initial judgment that certain conduct violates one of these rules is made by the principal. The principal is authorized by statute to suspend students for cause up to ten days. . . . A student found to be in violation of one of these rules is subject to long-term suspension.

## PART II
## Procedural Due Process Code
## For Dealing With Alleged Violations

. . . .

Alleged misconduct shall be dealt with by the principal or the principal's designee:
. . . .

(b) whenever the alleged misconduct constitutes a violation of the rule(s); or
(c) whenever the principal deems it advisable that he/she deal personally with the misconduct.

### Section 2. Principal's Investigation

In dealing with alleged misconduct, the principal or the principal's designee shall investigate the incident. . . . The student shall be given an opportunity to present his/her side of the incident and given an opportunity to deny or explain the allegations.

If the student requests that other witnesses be questioned, the principal shall talk to those witnesses, if possible. If the student makes a reasonable explanation of his/her side of the incident that, if true, would free the student from blame but evidence of the truth of the explanation is not immediately available, the principal should postpone disciplinary action for a reasonable time until such evidence may be presented to him/her.

. . . .

### Section 4. Limitation on Principal's Power
### to Suspend or to Request a Hearing

If the principal investigates a student's alleged misconduct and decides to take disciplinary action, the principal must investigate and take action only upon all alleged misconduct known to him/her at the time. Consequently, the most serious action the principal can take on his/her own authority for any and all misconduct by a particular student, known to the principal at any one time, is to give suspension for ten (10) school days. . . .

### Section 5. Summary Suspension

If the principal witnesses or has knowledge of any serious student misconduct and the principal thinks that immediate removal of the student is necessary to restore order or to protect persons on the school grounds, the principal may suspend the student immediately for not more than two (2) school days.

In such cases, the principal is not required to conduct the investigation described in Section 2 before he/she suspends; the principal shall carry out such an investigation and decide on further disciplinary action, if any, at least by the end of the school day following the summary suspension. If the principal thinks an additional suspension is necessary, the total suspended time shall not exceed ten (10) school days.

. . . .

## C. SECTIONS APPLICABLE TO LONG-TERM SUSPENSION AND EXPULSION

. . . .

If, after the principal's investigation, the principal decides that a penalty more severe than any within his/her own authority is warranted, the principal shall refer the matter to the Coordinator of Student Disciplinary Referrals.

We begin our analysis with the basic principles of contract construction which control our decision. Courts are to interpret and enforce the contract as written, according to its plain terms. *Petty v. Sloan*, 277 S.W.2d 355, 358 (Tenn. 1955); *Home Beneficial Ass'n v. White*, 177 S.W.2d 545, 546 (Tenn. 1944). We are precluded from making new contracts for the parties by adding or deleting provisions. *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 37 (Tenn. 1984); *Shell Oil Co. v. Prescott*, 398 F.2d 592 (6th Cir. 1968). When clear contract language reveals the intent of the parties, there is no need to apply rules of construction. An ambiguity does not arise in a contract merely because the parties may differ as to interpretation of certain of its provisions. *Oman Constr. Co. v. Tennessee Valley Auth.*, 486 F.Supp. 375 (M.D. Tenn. 1979). A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one; a strained construction may not be placed on the language used to find an ambiguity where none exists. *Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn. 1973). We are to consider the agreement as a whole in determining whether the meaning of the contract is clear or ambiguous. *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. App. 1994). If a contract is plain and unambiguous, the meaning thereof is a question of law for the court. *Petty v. Sloan*, 277 S.W.2d at 358.

Appellants argue that under the provisions of the Agreement as set forth above, Metro was obligated to appropriately discipline Student for his criminal misconduct occurring prior to the incident in question and that its failure to do so directly resulted in Warren's injuries. Appellants

specifically contend, in their brief, that "[g]iven the nature of the violation [criminal trespass on November 22], Mr. Mays had an obligation to impose a ten-day suspension on [Student]. Had Mr. Mays not breached his contractual duty, [Student] would not have even been in school on December 4, 1989 . . . ." In turn, Appellants argue that Turbeville had a corresponding duty to inform Mays of Student's misconduct so as to ensure that Student would be disciplined appropriately.

The Agreement provides that "[s]ystem-wide discipline regulations shall be published and made known" and that failure of a student to conform thereto "shall subject a student to disciplinary action." Under the express language of the Code of Student Conduct (Code), it is a violation of school rule to "cause or attempt to cause damage to school property or steal or attempt to steal school property." Clearly, the alleged misconduct by Student on November 22 is in violation of school rule. Under the plain language of the Code, the "principal or principal's designee" is required to deal with any "alleged misconduct" constituting a violation of school rules. To this end, the principal must conduct an "investigation." No specific time limit is imposed regarding the completion of such investigation. The Code does provide that if certain evidence exonerating the student is not immediately available, the principal should delay disciplinary action for a "reasonable time." The Code also makes clear that for any short-term suspension (not longer than 10 school days), it is the principal's decision as to whether disciplinary action is to be taken after an investigation. If, after an investigation, the principal determines that long-term suspension is appropriate, the matter is to be handled by the Coordinator of Student Disciplinary Referrals after notice and a hearing. The notice to the student and his/her parent(s) is to be given within 5 school days after the principal learns of the alleged misconduct. If a hearing is not waived it "should" be scheduled within 6 school days "after the request of the parents has been received for a hearing . . . ." If a hearing is waived, the Coordinator shall take steps to determine whether the student has violated a rule of serious misconduct and determine the penalty to be imposed within 6 school days "of the date that the principal referred the case to him/her." The Code further provides that the principal "may" summarily suspend a student for not longer than 2 school days, if the principal "thinks that immediate removal . . . is necessary." An investigation must then occur to determine whether further disciplinary action is needed "by the end of the school day following the summary suspension." The Code provides that "[i]f the principal thinks an additional suspension is necessary, the total suspended time shall not exceed ten . . . school days."

It is evident under the Code that whether disciplinary measures are to be taken and to what extent is a decision that lies initially with the principal who, in most instances, is required to first conduct an investigation prior to implementing any disciplinary action. The school rules, with the exception of those pertaining to the use of tobacco, alcohol or drugs, do not specify the punishment to be imposed for a violation thereof.[5] The Code provides for summary suspension and short and long-term suspension. The Code unmistakably leaves such at first instance to the discretion and judgment of the principal. Moreover, the language of the Code, with the exception of that pertaining to the conducting of an investigation, is permissive in nature and not mandatory. The Code also establishes built-in time delays in the disciplinary process. We therefore conclude that the Agreement does not impose a duty upon Mays to discipline Student for the alleged misconduct in a specific manner which would have guaranteed Student's absence from the school on December 4. Contrary to Appellants' assertion, the Code does not provide for an automatic suspension of 10 school days for the type violation with which Student was charged (criminal trespass).[6] Granted, the maximum suspension seems befitting under the circumstances (assuming Student's guilt), but the Code is clear that it is not mandatory.

Significant here, too, is the undisputed fact that Mays was not informed of Student's alleged misconduct and was, thus, prevented from contemplating any disciplinary action. We, however, do not find the Agreement to impose a duty upon Turbeville to relate such information. To support their argument, Appellants have relied upon the general language in the Agreement regarding the school board's assurance to teachers that it will provide "support and assistance" to teachers regarding student discipline. However, as will be discussed in more detail hereinafter, we find that it would be a strained interpretation of the contract to impose a duty upon Turbeville (Metro) to inform Mays of Student's alleged misdeed given the language utilized.

It is also argued that the Agreement imposed a duty upon Metro to warn Mrs. Warren

---

[5]The record reflects that during the fall semester of the 1989-90 school year, disciplinary action against Student included the following: paddling for using unacceptable language, cafeteria clean-up for 3 days for hitting female student, staying late after school for 3 days for forging principal's signature and suspension for 3 days for fighting.

[6]The Code defines a "short-term suspension" as "a denial to a student of the right to attend school . . . for any period up to and including ten (10) school days."

of Student's past criminal activity, to train her to intervene in student fights and/or provide trained security personnel. As to the latter, we find no language in the Agreement to remotely suggest that Metro was under a duty to afford faculty and staff with trained security personnel at the school. As to the personal training of Mrs. Warren, we find the Agreement to state:

> Teachers are expected to exert their best efforts and professional judgment to maintain discipline in the school. If fights involving students do occur on school property, a teacher is expected to do what any reasonable person would do under the circumstances. If circumstances warrant and permit, a teacher may use physical restraint to stop the fight.
>
> If the teacher is unable to stop the fight, assistance should be requested. . . .

We do not find the Agreement to obligate Metro to provide personal training to Mrs. Warren on student fight intervention. The fact that the school board and administration are obligated to provide "support" to teachers in maintaining discipline cannot be interpreted to include personal training absent a strained construction of the contract and a rewriting by this Court.

With respect to Metro's alleged duty to warn Mrs. Warren of Student's past criminal conduct, Appellants rely particularly on paragraph 5 of the student discipline section providing that "individual records on student discipline will be made available to teachers concerned as an aid to determining disciplinary recommendations concerning particular pupils." It is argued that "[t]his provision, in conjunction with subsection I(2) and the general intent of the parties to jointly create a safe and orderly learning environment, creates a duty on the part of [the] Board and/or Administration to provide teachers and faculty with information about a student's background . . . sufficient to let them make [an] informed judgment on how to interact with that student . . . ."

Paragraph I(7) states that the "general purpose of this provision shall be to provide concise information for both teacher and principal to assist them in cooperatively maintaining the best possible learning environment." As we interpret the clear language of Paragraph (5), the "concise information" to be conveyed pertains to individual student discipline records to those teachers "concerned" with determining disciplinary recommendations for particular students. Paragraph (5) cannot be interpreted to mean or imply that individual student discipline records are

made available to all teachers as a matter of routine, but to only those "concerned" teachers in aiding a determination of disciplinary recommendations for specific pupils.

We find that the "Student Discipline" section of the Agreement, when read as a whole, is written from the standpoint of the teacher and his/her role in "enforcing these [system-wide discipline] regulations." The Agreement provides that the school board and administration will support the teacher in his/her enforcement of the regulations (Paragraph 1) and in the teacher's "management of the classroom" to promote "effective classroom teaching" (Paragraph 2). Under paragraph 6, the Administration has the "responsibility to support teachers in all reasonable disciplinary measures" taken by the teacher to fulfill his/her "responsibility to maintain discipline and a climate for good instruction." Teachers "concerned" with "determining disciplinary recommendations" for "particular pupils" will be given access to those students' individual records on discipline. Finally, under paragraph 3, the Administration is obligated to "take positive steps to assist the teacher" in ascertaining the appropriate personnel for those students in need of specialized attention. To interpret this paragraph otherwise would render the words "will take positive steps" overly vague and meaningless.

We conclude that no fair interpretation of the Agreement can be said to legally impose upon Metro the contractual duties as alleged by Appellants. Certainly, the provision of trained security personnel on school grounds, individual training of faculty and staff regarding student fight intervention and routine notice to teachers of children with propensities for violence and/or a criminal history is commendable conduct which would undoubtedly benefit the public education system and go further in promoting a safe and orderly learning environment. We, however, do not find the Agreement before us to legally require such obligations of Metro. A summary judgment is an appropriate means of disposing of claims capable of resolution on legal issues alone. *McReynolds v. Cherokee Ins. Co.*, 896 S.W.2d 137 (Tenn. App. 1994); *Nichols v. Atnip*, 844 S.W.2d 655, 658 (Tenn. App. 1992). As we have determined as a matter of law that the Agreement does not impose upon Metro the contractual duties as alleged by Appellants, we conclude that a summary judgment was properly granted in Metro's favor. In view of our decision, we pretermit the remaining issues.

The judgment of the trial court is affirmed and this cause remanded for any further proceedings consistent with this opinion.  Costs are taxed to the appellants, for which execution may issue if necessary.


_____
FARMER, J.


_____
CRAWFORD, P.J., W.S. (Concurs)


_____
LILLARD, J. (Concurs)