IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 2000 Session

# INTERNATIONAL FLIGHT CENTER v. CITY OF MURFREESBORO, ET AL.

**Appeal from the Chancery Court for Rutherford County**
**No. 95CV-1139     Royce Taylor, Circuit Judge Sitting as Chancellor**

_____

**No. M1999-00324-COA-R3-CV - Filed August 16, 2000**

_____

This appeal arises out of a dispute between Plaintiff International Flight Center ("IFC") and Defendants City of Murfreesboro ("City") and City of Murfreesboro Airport Committee ("Airport Committee") regarding the alleged breach of a lease agreement and the nonpayment of certain property taxes. The trial court granted a judgment in favor of IFC in the amount of $174,718.00 plus ten percent prejudgment interest. Additionally, the court ruled that the City is estopped from collecting the property taxes allegedly owed to the City by IFC. On appeal, we reverse the trial court's finding that the City breached the parties' 1989 lease agreement, vacate the court's ruling regarding the jet fuel equipment that was purchased by IFC but that remained at the Airport following the expiration of the parties' 1989 lease agreement, remand the cause for further findings of fact regarding this jet fuel equipment, affirm the court's ruling regarding the matter of prejudgment interest to the extent hereinafter discussed, and reverse the court's ruling that the City is estopped from collecting the real and personal property taxes allegedly owed to the City by IFC.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; Vacated in Part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY K. LILLARD, J., joined.

Susan Emery McGannon and Jerry E. Farmer, Murfreesboro, Tennessee, for Appellant, City of Murfreesboro and City of Murfreesboro Airport Committee.

Daniel C. Masten and W. H. Stephenson, Nashville, Tennessee, for appellee, International Flight Center.


**OPINION**

The City owns the Murfreesboro Municipal Airport ("Airport"). The Airport Committee is an advisory board that establishes policies for the use of the Airport and oversees the day-to-day operations of the Airport. IFC is a corporation that provides flight training, airport management, and airport services.[1] IFC entered into leases with the City in 1980, 1982,[2] and 1989 under which IFC was entitled to operate a flight school and an aircraft maintenance shop at the Airport. In exchange for this right, IFC was required (1) to pay rent to the City in the amount of $3,000.00 per month, (2) to serve without compensation as the manager of the Airport, (3) to maintain and operate the Airport in accordance with the standards and requirements established by the Federal Aviation Administration, the Federal Aviation Administration Safety Agency, and the United States Secretary of Transportation, (4) to operate the Airport for the use and benefit of the public and maintain the Airport facilities used by the public, (5) to make available all Airport facilities and services to the public without discrimination, (6) to refrain from imposing excessive, discriminatory, or otherwise unreasonable charges or fees for the use of the Airport, Airport facilities, or Airport services, and (7) to provide at its own expense liability insurance for the Airport. The 1982 lease provided that IFC was permitted to install a jet fuel fueling system and that the City agreed to pay fifty percent of the expenses associated with this system if IFC did not remain as the City's lessee for at least ten years. The 1989 lease contained a provision stating that the City will not "permit or allow any other flight school operator or aircraft maintenance facility to operate on said airport under more favorable terms and conditions than the Lessee herein, or without requiring that any such other operator furnish or be furnished services and facilities equal to those of Lessee." In February of 1992, Tennessee Air Academy ("TAA") began renting tie-down spaces at the Airport, purchasing fuel from IFC at the Airport, executing take-offs and landings using the Airport runway, and using other public areas of the Airport such as its restrooms, ramp, tarmac, terminal, and taxiways. TAA did not operate a ground school at the Airport, but instead rented office space in a shopping center near the Airport and provided training and instruction to its students at that location. After TAA began using the Airport's facilities, IFC began losing students and flight instructors, causing IFC to experience a decrease in profits. After notifying IFC that it did not want to renew the parties' 1989 lease, which was to expire at the end of August 1994,[3] the City attempted to collect certain real estate and personal property taxes allegedly owed to the City by IFC. The City subsequently resumed management of the Airport, refusing to allow IFC to remove certain jet fuel equipment, infra-red heaters, and an air compressor that it had purchased during the terms of the parties' leases.

In August of 1995, IFC filed a complaint against the City and the Airport Committee alleging that they had breached the parties' 1989 lease agreement by allowing TAA to operate a flight training school at the Airport on terms more favorable than the terms of their agreement with IFC and by

_____

[1] IFC was originally located in McMinnville, Tennessee and was incorporated in 1975 under the name McMinnville Aviation. When McMinnville Aviation relocated to Murfreesboro in 1979 and began operating at the Airport, the name of the corporation was changed to International Flight Center.

[2] The 1982 lease was extended for three additional years following its stated expiration date of April 30, 1987.

[3] On August 31, 1994, the parties entered into a written agreement extending the term of the 1989 lease by three months so that it did not expire until November 30, 1994.

preventing IFC from removing some equipment owned by IFC that is located at the Airport. In October of 1995, the City filed a motion to dismiss the Airport Committee as a defendant,[4] an answer to IFC's complaint, and a counter-complaint against IFC alleging that IFC had failed to pay certain real and personal property taxes owed to the City for the tax years 1988 through 1994. IFC filed an answer to the City's counter-complaint in March of 1997. In October of 1997, the trial court dismissed IFC's complaint for lack of prosecution. In January of 1998, however, the court granted a motion filed by IFC to set aside the dismissal of its complaint. The matter was finally heard on April 26, 27 and 28, 1999, after which the court ruled (1) that the City had breached its agreement with IFC, (2) that, as a result of the breach, IFC sustained economic loss in the amount of $142,700.00, (3) that IFC is entitled to recover $30,000.00 for a jet fuel tank and system and $6,000.00 for an air compressor and two heaters that were owned by IFC but that were in the possession of the City, (4) that the City is entitled to off-set its obligation to IFC by $1,982.00, the amount of a utility bill that had not been paid by IFC, and $2,000.00, the amount of the expenses incurred by the City in repairing and maintaining certain buildings at the Airport that had been vacated by IFC, (5) that IFC should be awarded prejudgment interest at the rate of ten percent, and (6) that the City is estopped from collecting the taxes that it is owed by IFC. An order reciting this ruling was entered by the court on May 24, 1999. This appeal by the City followed.

This issues raised by the parties on appeal, as we perceive them, are as follows:

I.      Did the trial court err in ruling that the City breached the parties' 1989 lease?
II.     Did the trial court err in determining the amount of damages that IFC sustained as a result of the City's alleged breach of the parties' 1989 lease?
III.    Did the trial court err in awarding prejudgment interest to IFC?
IV.     Did the trial court err in ruling that the City is estopped from collecting certain real and personal property taxes from IFC?

To the extent that these issues involve questions of fact, our review of the trial court's ruling is *de novo* with a presumption of correctness and thus we may not reverse the court's factual findings unless they are contrary to the preponderance of the evidence. ***See, e.g., Randolph v. Randolph***, 937 S.W.2d 815, 819 (Tenn. 1996); T.R.A.P. 13(d). With respect to the court's legal conclusions, however, our review is *de novo* with no presumption of correctness. ***See, e.g., Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.***, 986 S.W.2d 550, 554 (Tenn. 1999); T.R.A.P. 13(d).

### *Breach of Lease Agreement*

---

[4] There is nothing in the record showing that the trial court ever considered or ruled on the motion to dismiss the Airport Committee. It is notable, however, that although no reference to the Airport Committee is contained in the court's April 28, 1999 bench ruling on IFC's complaint, the court's May 24, 1999 order reciting this ruling states that the City and the Airport Committee are jointly and severally liable for the damages sustained by IFC.

The trial court determined that the City had breached the terms of the parties' 1989 lease agreement. When reviewing this ruling, we are required to apply the legal principles relative to the interpretation and construction of contracts. The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *See Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995); *Breeding v. Shackelford*, 888 S.W.2d 770, 775 (Tenn. Ct. App. 1994); *Rainey v. Stansell*, 836 S.W.2d 117, 118 (Tenn. Ct. App. 1992); *Park Place Ctr. Enters., Inc. v. Park Place Mall Assocs., L.P.*, 836 S.W.2d 113, 116 (Tenn. Ct. App. 1992). In attempting to ascertain the intention of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996); *Rainey*, 836 S.W.2d at 119. Additionally, the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. *See Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *New Life Corp. v. Thomas Nelson, Inc.*, 932 S.W.2d 921, 925 (Tenn. Ct. App. 1996); *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993). When the language of the contract is plain and unambiguous,[5] the court must determine the parties' intention from the four corners of contract, interpreting and enforcing it as written. *See Koella v. McHargue*, 976 S.W.2d 658, 661 (Tenn. Ct. App. 1998); *Gates, Duncan & Vancamp Co. v. Levatino*, 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997); *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986).

Item Five of the 1989 lease agreement provides as follows:

> Lessor covenants and agrees that it will not permit or allow any other Flight School Operator or Aircraft Maintenance facility to operate on said airport under more favorable terms and conditions than the Lessee herein, or without requiring that any such other Operator furnish or be furnished services and facilities equal to those of Lessee.

As stated above, TAA began renting tie-down spaces at the Airport, purchasing fuel at the Airport, executing take-offs and landings using the Airport runway, and using other public areas of the Airport in February of 1992. TAA did not pay rent to the City in exchange for the right to use the Airport runway or other public areas of the Airport. Additionally, there is no evidence that TAA was required to provide any services to the City in exchange for this right. IFC thus argues, and the trial court agreed, that the City permitted or allowed TAA to operate on the Airport under more favorable

---

[5] A contract is not rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions. *See Warren v. Metropolitan Gov't of Nashville and Davidson County*, 955 S.W.2d 618, 623 (Tenn. Ct. App. 1997); *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.*, 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994). Rather, a contract is ambiguous only if its meaning is uncertain and is susceptible to more than one reasonable interpretation. *See Bonastia v. Berman Bros.*, 914 F. Supp. 1533, 1537 (W.D. Tenn. 1995); *Warren*, 955 S.W.2d at 623; *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. Ct. App. 1995); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994).

terms and conditions than IFC and did not require TAA to furnish the same or equivalent services as those provided by IFC.

In order to determine whether the City violated Item Five of the 1989 lease agreement, we must attempt to ascertain what the parties meant when they used the word "operate." Because the Airport receives federal funds and is considered to be a public airport,[6] it is required by law to make its facilities and services available to the public without unjust discrimination. *See* 49 U.S.C. § 47107(a)(1) (1997 & Supp. 2000).[7] Consistent with this requirement, Item Sixteen of the lease agreement specifically provides as follows:

> The Lessee agrees to operate the airport for the use and benefit of the public; to keep and maintain the airport facilities used by the public in comparable condition (i.e., clean, neat and comfortable) with other public buildings which are maintained for public use by the City of Murfreesboro; to make available all airport facilities and services to the public without discrimination; and to refrain from imposing or levying excessive, discriminatory or otherwise unreasonable charges or fees for any use of the airport or its facilities or for any airport service. It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act of 1958, as amended.

Thus, when the parties agreed that the City would not allow another flight school to operate at the Airport under terms more favorable than those enjoyed by IFC or without requiring the school to provide services equivalent to those provided by IFC, the parties understood that such activity did not include the simple use of the Airport by members of the public which, under federal law, cannot be prohibited by the City or the Airport. In the instant case, TAA did not operate a ground school at the Airport. Rather, TAA provided classroom instruction to its students at an office that it rented near the Airport. TAA used only the facilities and services of the Airport that other members of the public had the right to use. Thus, based on our review of the language of the 1989 lease agreement, when read in light of the laws governing the operation of public airports, we simply do not think that the word "operate," as used by the parties, was meant to include the activities that TAA conducted at the Airport. Consequently, we conclude that the City did not breach Item Five of the parties 1989 lease agreement by allowing TAA to use the Airport's facilities and services and hold that the City is not liable for any damages sustained by IFC as a result of the competition that it received from

---

[6] Under federal law, the term "public airport" is defined as an airport used or intended to be used for public purposes that is under the control of a public agency and of which the area used or intended to be used for the landing, taking off, or surface maneuvering of aircraft is publically owned. *See* 49 U.S.C. § 47102(16) (1997).

[7] Specifically, the Airport is prohibited from granting an exclusive right to conduct an aeronautical activity such as pilot training. *See* 49 U.S.C. § 47107(a)(4) (1997 & Supp. 2000). The Airport is permitted, however, to restrict the commercial use of the Airport based on nondiscriminatory standards and may insist that the person, firm, or corporation using the Airport meet certain standards regarding the quality and level of services offered to the public so long as those standards are reasonable, relevant to the proposed activity, and applied objectively and uniformly.

TAA. We therefore reverse the trial court's ruling that IFC is entitled to damages for breach of contract in the amount of $142,700.00.

## *Jet Fuel Equipment*

As stated above, when the parties' 1989 lease terminated and the City resumed management of the Airport, the City did not allow IFC to remove from the Airport certain jet fuel equipment that IFC had previously purchased. With respect to this equipment, the parties' 1982 lease agreement states as follows:

> Lessor has previously approved jet fuel tanks and accessories which are to be installed by Lessee. The parties hereto agree and understand that the total cost and expense of same shall be paid by Lessee. However, the parties hereto agree that a reasonable period for amortization of the cost of same is ten (10) years. Since the lease term is for only five (5) years, Lessor hereby agrees to reimburse Lessee for half of the original cost in the event Lessor refuses to extend this Lease Agreement to the Lessee or Lessee's assigns or successor at the termination of the term of this Lease Agreement.

After the purchase of the aforementioned jet fuel equipment, IFC remained at the Airport for more than ten years. Thus, there is no dispute that the City was not required to reimburse IFC for any portion of the cost of the equipment. The trial court found, and this Court agrees, that the provision contained in the 1982 lease regarding the jet fuel equipment relates only to this possible reimbursement and does not in any way relate to the ownership of the equipment.

The jet fuel equipment that was purchased by IFC and used by IFC at the Airport is a trade fixture.[8] When a tenant such as IFC ceases to occupy leased premises such as the Airport, the tenant may remove any trade fixtures that the tenant has affixed to the property so long as the removal can be accomplished without causing material injury to the property. *See Cubbins v. Ayres*, 72 Tenn. 329, 331 (Tenn. 1880); *Green v. Harper*, 700 S.W.2d 565, 567 (Tenn. Ct. App. 1985). In the instant case, the trial court ruled that, because IFC paid the purchase price for the jet fuel equipment that is in dispute and because the City received value by retaining this equipment after IFC's departure from the Airport, IFC should be awarded a judgment in the amount of $30,000.00, the value of the equipment. The court did not, however, make any finding regarding whether the equipment could be removed from the Airport without causing material injury to the property. We therefore vacate the trial court's ruling regarding the disputed jet fuel equipment and remand the matter so that the trial court can make a determination regarding the feasibility of removing the equipment. If the court concludes that the jet fuel equipment can be removed without causing material injury to the Airport, then the court should re-enter its judgment in favor of IFC in the amount of $30,000.00. If, however,

---

[8]The term "trade fixtures" has been defined as "[a]rticles placed in or attached to rented buildings by the tenant, to prosecute the trade or business for which he occupies the premises, or to be used in connection with such business, or promote convenience and efficiency in conducting it." Black's Law Dictionary 574 (5th ed. 1979).

the court finds that the equipment cannot be removed without causing material injury to the Airport, then the court should rule that IFC is not entitled to a judgment for the value of this equipment.

### *Prejudgment Interest*

Trial courts are authorized by section 47-14-123 of the Tennessee Code Annotated to award prejudgment interest in accordance with principles of equity. *See* Tenn. Code Ann. § 47-14-123 (1995). The purpose of awarding prejudgment interest is to fully compensate the plaintiff's loss, not to penalize the defendant's wrongdoing. *See Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). Trial courts are afforded a great deal of discretion and are entitled to deference regarding the determination of whether to award prejudgment interest. *See Myint*, 970 S.W.2d at 927; *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994); *Wilder v. Tennessee Farmers Mut. Ins. Co.*, 912 S.W.2d 722, 727 (Tenn. Ct. App. 1995). Thus, an award of prejudgment interest will not be reversed on appeal unless it is clear that the court abused its discretion. *See Myint*, 970 S.W.2d at 927; *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994). An award of prejudgment interest is generally appropriate when the amount of damages to which the plaintiff is entitled is certain. *See Myint*, 970 S.W.2d at 927; *Mitchell*, 876 S.W.2d at 832. The test for determining certainty of damages is whether the amount of damages can be ascertained by computation or by any recognized standard of valuation. *See Myint*, 970 S.W.2d at 928. Although the certainty of a damage amount supports an award of prejudgment interest, the uncertainty of the amount does not necessarily mandate that the plaintiff's request for prejudgment interest must be denied and the trial court's granting of prejudgment interest under such circumstances is not necessarily an abuse of discretion. *See Myint*, 970 S.W.2d at 928. Additionally, the plaintiff is generally awarded prejudgment interest when the existence of the obligation itself is not disputed on reasonable grounds. *See Myint*, 970 S.W.2d at 927; *Mitchell*, 876 S.W.2d at 832.

In the instant case, the trial court awarded ten percent prejudgment interest to IFC with respect to IFC's $142,700.00 judgment for breach of contract, $30,000.00 judgment for the jet fuel equipment retained by the City, and $6,000.00 judgment for the air compressor and heaters retained by the City. In previous sections of this opinion, we reversed the ruling of the trial court regarding the City's alleged breach of contract and vacated the court's ruling regarding the jet fuel equipment. On remand, however, it is possible that after making further findings of fact the trial court will re-enter its $30,000.00 judgment for the value of the jet fuel equipment. Thus, we review the court's ruling regarding the matter of prejudgment interest only as it applies to IFC's award for the value of the jet fuel equipment and its award for the value of the air compressor and heaters. These values are certain in that they were ascertainable by the trial court after hearing the testimony of the witnesses. Although the City did not attempt to deny that the air compressor and heaters were owned by IFC, the City did argue that it was the intention of the parties that the jet fuel equipment would remain at the Airport and become the property of the City upon IFC's departure from the Airport. It is also notable that, because the City retained the jet fuel equipment, air compressor, and heaters and did not allow IFC to remove them from the Airport, IFC lost the use of these items during the period of time between the termination of the lease and the date of trial. Under these circumstances, we think that an award of prejudgment interest is equitable and that the trial court did

not abuse its discretion in awarding prejudgment interest to IFC. The court's ruling with respect to this matter is therefore affirmed.

## *Real and Personal Property Taxes*

As part of its answer to IFC's complaint, the City filed a counter-complaint against IFC seeking a judgment for certain real and personal property taxes that IFC allegedly owed the City for the tax years 1988 through 1994. In its answer to the City's counter-complaint, IFC denied that it owed the taxes and did not raise any affirmative defenses to the counter-complaint. With respect to these taxes, the trial court ultimately ruled as follows:

> I think the taxes present a very interesting question in that no taxes were assessed to IFC up until 1988 according to the County because it was [a] lease hold estate and because personal property taxes were not normally assessed. So those matters had not been addressed in the prior lease. Obviously the City in negotiating the lease can take into effect where they're dealing with someone leasing their own property which is not normally taxable, but once it becomes a lease hold, the estate can be taxed. They can adjust their lease accordingly to make adjustments for the taxes. And so that was not done in the prior leases and was not addressed in the current leases and the taxes were not assessed or evidently no one was aware that the taxes were going to be assessed until after the '89 lease was entered into and they started getting tax bills. Mr. Berg testified that the airport authority indicated to him that that would not be a problem. They would address that issue. And they never did readjust his lease to address that issue. It wasn't until after this breach occurred that they started mentioning taxes. They went for several years without ever addressing the issue and reassuring Mr. Berg, according to his testimony, and there was not anyone here from the airport authority to refute that, that would be taken care of. So I think that they are estopped from collecting their taxes. Obviously the County is not, but the City, I think, has an estoppel problem in there, that they did not intend to have those taxes assessed to him. It was done by the County, and it was not included in the lease and after it was made aware to the airport authority, they kept assuring Mr. Berg that it would be taken care of it. The City itself then was estopped from pursuing the collection of the taxes from the years 1988 through 1994.

Under Rule 12 of the Tennessee Rules of Civil Procedure, every defense to a claim for relief must either be raised in a responsive pleading or in a written motion. *See* T.R.C.P. 12.02. The theory of estoppel is an affirmative defense and thus is subject to the requirements of Rule 12. *See Bilbrey v. Smithers*, 937 S.W.2d 803, 808 (Tenn. 1996); *Gates, Duncan & Vancamp Co. v. Levatino*, 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997); *TBC Corp. v. Wall*, 955 S.W.2d 838, 839 (Tenn. Ct. App. 1997). In the case at bar, IFC did not raise the affirmative defense of estoppel in any of its responsive pleadings or in a written motion. Nor did IFC argue this affirmative defense at trial. Rather, the trial court, *sua sponte*, determined that the City was estopped from collecting the taxes that it was allegedly owed by IFC. The City therefore did not have any notice of the estoppel defense and was not afforded an opportunity to prepare a response to the defense. Because

IFC did not raise the issue of estoppel prior to trial as contemplated by Rule 12 and because we do not think the issue was tried by consent, we conclude that the affirmative defense of estoppel was waived by IFC and consequently hold that it was inappropriate for the court to base its ruling on this theory. We therefore reverse the court's conclusion that the City is estopped from collecting the disputed taxes. On remand, the trial court is instructed to determine, without regard to the theory of estoppel, whether IFC has a real and/or personal property tax obligation to the City. If the trial court concludes that IFC does owe real and personal property taxes to the City, the court should make a finding regarding the precise amount of this obligation and enter a judgment in favor of the City equal to this amount.

## *Conclusion*

Based on the forgoing, we (1) reverse the trial court's conclusion that the City breached the parties' 1989 lease agreement, (2) vacate the court's ruling regarding the jet fuel equipment, (3) remand the cause so that the court can determine whether the aforementioned jet fuel equipment is capable of being removed without causing material injury to the Airport, (4) affirm the court's award of ten percent prejudgment interest to IFC,[9] and (5) reverse the court's ruling that the City is estopped from collecting the real and personal property taxes allegedly owed to the City by IFC. The costs of this appeal are taxed to IFC, and its surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

---

[9]As noted above, our ruling regarding this matter applies only to the interest that has accrued on IFC's judgment for the value of the air compressor and heaters and, if this judgment is reentered on remand, the interest that has accrued on IFC's judgment for the value of the jet fuel equipment.