IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 2, 2003 Session

## JAMES W. STEPHENSON v. THE THIRD COMPANY, ET AL.

**Appeal from the Circuit Court for Robertson County**
**No. 9254     Ross H. Hicks, Judge**

---

**No. M2002-02082-COA-R3-CV - Filed February 27, 2004**

---

The plaintiff filed suit for repayment of $25,000 which he purportedly loaned to the defendant. The defendant contended that the money was not a loan, but was placed with him for a specific investment. Since the investment ultimately failed, the defendant claimed that he did not owe anything to the plaintiff. The trial court noted that the documents evidencing the transactions at issue were "replete with ambiguities," but found that they were nonetheless sufficient to establish an enforceable loan contract. The court accordingly rendered a plaintiff's judgment for $25,000 plus interest. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN, J., joined. WILLIAM C. KOCH, P.J., M.S., filed a dissenting opinion.

Winston S. Evans, Nashville, Tennessee, for the appellant, The Third Company and Richard C. L. Caldwell, individually.

John B. Holt, Springfield, Tennessee, for the appellee, James W. Stephenson.

**OPINION**

## I. A LOAN OR AN INVESTMENT?

The transactions from which this case arose had their origins in a business relationship between defendant Richard Caldwell and a non-party named Johnny Knight. Mr. Caldwell first became acquainted with Mr. Knight when the latter's company, Knight's Machinery, went through bankruptcy and a bankruptcy attorney suggested that Mr. Caldwell take a look at his business. Mr. Knight's business was buying used sawmill equipment at auctions, refurbishing it, and selling it for a profit. Mr. Caldwell met with Mr. Knight and concluded that with proper management, the business had the potential to generate large profits. He described Mr. Knight as a good salesman,

"best I ever saw," but a bad manager.

Mr. Knight's business was reorganized as Knight's Enterprises, and Mr. Caldwell was hired to oversee all its financial affairs. Auctions are conducted on a cash basis, so it quickly became apparent to Caldwell that Knight would need substantial infusions of cash in order to operate. After going to several local banks, it became equally apparent to Caldwell that because of the bankruptcy, Knight would not be able to borrow money to operate the business.

Mr. Caldwell's solution was to create a sole proprietorship called the Third Company to raise money and manage cash flow for Knight's Enterprises. According to Caldwell's testimony, the creation of a separate company as a conduit for invested funds protected him from commingling his own assets with the money he furnished to Knight, and enabled him to easily keep track of all the money disbursed to or received from Knight.

Caldwell invested $35,000 of his own money in the Third Company. He also persuaded a man named Dorris Head to make a $100,000 investment. However, the only money at issue in this case is the $25,000 that was furnished to the Third Company by a man named James Stephenson.

Richard Caldwell and Mr. Stephenson (who usually went by the name Steve Stephenson) were social acquaintances. Caldwell explained Knight's business to Stephenson, and suggested that he might be able to participate financially in it. Mr. Stephenson agreed, and on August 25, 1998, the parties executed two documents which had been prepared by Mr. Caldwell without the assistance of an attorney.

The first document, titled "Loan Agreement," recites a loan of $15,000 from Mr. Stephenson to the Third Company, with 10% annual interest. While the language and terms of this agreement are probably typical of most loan documents, the repeated references in it to the business of a third party are not. For example, the section called "Loan Amount" states that the $15,000 is "for the use of participating in the Knight's Enterprises inventory and equipment project."

Under "Purpose," the document recites that "[t]he purpose of the loan is to participate with the Third Company in the inventory and equipment financing for Knight's Enterprises of Tennessee, Inc. I understand that the funds I loan the Third Company will be placed with Knight's Enterprises for the purchase of inventory and resale." Under "Collateral," it states, "Lender understands that the collateral for his funds is limited to the inventory and equipment that the Borrower has on its books collateraled (sic) by Knight's Enterprises." The section on interest rate states that "[i]nterest will be calculated against funds deployed for the benefit of Knight's Enterprises."

On October 21, 1998, Mr. Stephenson signed a second "Loan Agreement" containing identical language. This agreement was for an additional $10,000. Hereinafter, when we refer to "the Loan Agreement," we will either be referring to the first document so titled, or to both documents, depending on the context.

On the same day that they signed the first loan agreement, the parties executed a second document, titled "Consulting Agreement." Its stated purpose was "to hire the services and expertise of Steve Stephenson in order to enhance the efficiency of the Third Company." Under this Agreement, consultant fees are due and payable each month, in an amount "based on 5% of the funds which Mr. Stephenson has employed with the Third Company."[1]

The proof showed that Mr. Stephenson had no expertise in the business of either the Third Company or Knight's Enterprises and that, even though he never performed any consulting services, he received monthly payments totaling over $5,000 under the "Consulting Agreement" before the parties agreed to suspend the agreement five months after its execution.

After some initial success, Knight's Enterprises faltered, and payments to Mr. Stephenson came to a halt. On May 3, 2000, he filed a Complaint in the Robertson County Circuit Court naming the Third Company and Richard Caldwell as defendants. The plaintiff asked for repayment of the $25,000 plus interest, as well as punitive damages. He alleged fraud on the part of Mr. Caldwell, a claim which he did not pursue at trial. The Complaint did not mention the "Consulting Agreement," or any of the payments received under it.

The defendant's Answer denied any wrongdoing, and stated that since the stated purpose of the Agreement between the parties was to participate with the Third Company in financing inventory and equipment for Knight's Enterprises of Tennessee, the obligation of repayment was conditioned upon the Third Company first receiving payment from Knight's Enterprises.[2]

## II. Court Proceedings

The case came to trial on April 23, 2002. The only witnesses to testify were Mr. Stephenson and Mr. Caldwell. Mr. Stephenson seemed to have a fair understanding of the nature of Knight's Enterprises and the role of the Third Company in its financing, but his understanding of the nature of his own involvement appeared murky at best.

He stated several times that he had invested in the Third Company, and that he was one of the investors in that company, but he didn't know if the investment was an equity interest because he didn't know the meaning of that term. He testified that he knew that the Third Company was going to pay him and the other investors a commission when equipment was sold, and that whatever money the Third Company received would be distributed to the investors, including him. He stated

---

[1]Mr. Caldwell testified that this provision mirrored a proposed agreement that Knight would pay Third Company 5% per month for funds advanced to him for the purchase of equipment. According to Mr. Caldwell, Mr. Knight refused to sign the proposed agreement, but verbally agreed to abide by it, and did so during the first few months .

[2]Mr. Caldwell testified that he and Mr. Head brought suit against Mr. Knight to recover funds which Knight had allegedly embezzled, and invited Mr. Stephenson to join that suit as a plaintiff. Mr. Stephenson declined and sued Caldwell instead.

3

that he understood there was a risk associated with the investment, but that the possible reward "looked very good."

Mr. Caldwell's testimony as to the disposition of the money was consistent with that of Mr. Stephenson. He testified that all the money that was invested went to Knight's Enterprises, and that all the money received as profit from the operation of that company was distributed to the investors in the Third Company (including Mr. Stephenson) on a pro rata basis as it was received.

He also gave a lengthy account of his dealings with Mr. Knight and of the declining fortunes of Knight's Enterprises. According to Mr. Caldwell, after an initial period of success, Mr. Knight instructed equipment buyers to wire their payments directly to his private account, and he used those funds (amounting to over $150,000) to begin a 5,000 square foot addition to his house, instead of turning them over to the Third Company as he had agreed to. When Caldwell could not deter Knight from using the company's money for personal purposes, he resigned as financial officer of Knight's Enterprises.

At the conclusion of closing arguments, the trial judge announced his decision from the bench. He stated that the loan documents of August 28 and October 21 were "replete with ambiguities," but that he had to construe them against Mr. Caldwell as the preparer of those documents. He noted their frequent use of the word "loan" and the reference to the parties as borrower and lender. The judge concluded that the agreement was indeed a loan, and that the defendants owed the plaintiff $25,000 plus interest. He further declared that the consulting agreement was a separate document, and that Mr. Caldwell was not entitled to any credit for payments made under the terms of that agreement. This appeal followed.

## III. ANALYSIS

The question of interpretation of a contract is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Id.*; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the documents ourselves and make our own determination regarding their meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). Our review is governed by well-settled principles.

### A. AN AMBIGUOUS CONTRACT

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions. *Id.*; *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). Thus, it is well-established that "[t]he cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Pearsall Motors Inc. v. Regal Chrysler-Plymouth, Inc.*,

4

521 S.W.2d 578, 580 (Tenn. 1975). *See also Galleria Associates, L.P. v. Mogk*, 34 S.W.3d 874, 876-7 (Tenn. Ct. App. 2000), *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999), *Hamblen County v. City of Morristown* 656 S.W.2d 331,333 (Tenn. 1983).

As a general rule, the intent of the parties is presumed to be that specifically expressed in the written contract. *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors*, 521 S.W.2d at 580.

Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin Co.*, 78 S.W.3d at 890. If the contract is unambiguous, then the court may not look beyond its four corners to ascertain the parties' intention. *Rogers v. First Tennessee Bank National Ass'n,* 738 S.W.2d 635,637 (Tenn. Ct. App. 1987). *Bokor v. Holder,* 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986). But, where a contractual provision is ambiguous, *i.e.*, susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Planters Gin Co.*, 78 S.W.3d at 890. In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. *Id.* Then, the court must examine other evidence to ascertain that intention. Such evidence might include the negotiations leading up to the contract, the course of conduct the parties followed as they performed the contract, and any utterances of the parties that might shed light upon their intentions. *Pinson & Associates Ins. v. Kreal,* 800 S.W.2d 486, 487 (Tenn. Ct. App. 1990), *Jackson v. Miller*, 776 S.W.2d 115, 118 (Tenn. Ct. App. 1989), *Patterson v. Anderson Motor Co.*, 319 S.W.2d 492, 497 (Tenn. Ct. App. 1958).

In *Turner v. Zager*, 363 S.W.2d 512, 519 (Tenn. Ct. App. 1962), we stated that, "[i]t is the duty of the court in the construction of contracts to ascertain the intention of the contracting parties, understand what they meant by the contract, and give effect to such understanding and meaning. All other rules of construction are only aids or helps in establishing the intention of the parties and for mutual understanding of the meaning of their contract." *See also Commerce Street Company Inc. v. Goodyear Tire and Rubber Company, Inc.*, 215 S.W.2d 4, 10 (Tenn. Ct. App. 1948).

Further, in construing contracts, courts must look at the language and the parties' intent and impose a construction that is fair and reasonable. *ACG, Inc. v. Southeast Elevator, Inc.* 912 S.W.2d 163, 168 (Tenn. Ct. App. 1995). Reasonableness must be viewed in light of the parties' situation at the time of the making of the agreement as well as at the time performance becomes due. *Hathaway v. Hathaway*, 98 S.W.3d 675, 680-81 (Tenn. Ct. App. 2002). The language of a contract should be construed with reference to the situation of the parties, the business to which the contract relates, the subject matter of the agreement, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. *Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *International Flight Center v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2001). The course of conduct of the parties is

strong evidence of the parties' original intent. *Pinson & Associates*, 800 S.W.2d, at 487.

The trial court explicitly found that the loan contract was ambiguous, a finding with which we concur. While parts of it read like a standard contract to lend money, the inclusion of language indicating that the loan's purpose is "to participate with the Third Company in the inventory and equipment financing for Knight's Enterprises ..," and other language referencing that third party business is more typical of some kind of joint venture or an investment contract.

The trial court chose to focus solely on the loan-specific language in the contract to reach his decision. It thus failed to take into account both the ambiguous language and Mr. Stephenson's own testimony as to his understanding of the relationship he had entered into with the Third Company and its connection to Knight's Enterprises. We note that a contract must be construed as a whole, and effect given to every part. "It is the universal rule that a contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another" *Cocke County Bd of Highway Commissioners v. Newport Utilities Board,* 690 S.W.2d 231, 237 (Tenn. 1985). "The proper construction of a contractual document is not dependent on any name given to the instrument by the parties, or on any single provision of it, but upon the entire body of the contract and the legal effect of it as a whole." *Aetna Casualty & Surety Co. v. Woods,* 565 S.W.2d 861, 864 (Tenn. 1978). In addition, the loan agreements were only part of the transaction between the parties.

## B. The Significance of the Consulting Agreement

It has long been recognized that when different documents are executed as part of the same transaction, they must be construed together. *Realty Shop, Inc.*, 7 S.W.3d at 599; *Ferguson v. Peoples Nat. Bank of LaFollette*, 800 S.W.2d 181, 183 (Tenn. 1990); *Oman Construction Company v. Tenn. Central Railroad,* 370 S.W.2d 563, 574 (Tenn. 1963).

The loan agreement and the consulting agreement were between the same parties and were executed at the same time. Mr. Stephenson argues that the consulting agreement was separate from the loan agreement because it was supported by separate consideration. But the proof shows that Mr. Stephenson had no expertise as a consultant and provided no expertise, so the recited consideration in the consulting agreement was illusory on his part.

However, the consideration on Mr. Caldwell's part was directly tied to the loan agreement, by being "based on 5% of the funds in which Mr. Stephenson has employed with the Third Company." Contrary to Mr. Stephenson's argument, it thus appears to us that the true purpose of the Consulting Agreement was to furnish additional consideration for the use of Mr. Stephenson's funds. We believe the two documents were executed as part of the same transaction, and that we must construe them together in order to understand what amounts to a single transaction.

## C. *CONTRA PROFERENTUM*

When we construe the two documents together, we cannot conclude that the intention of the parties can be correctly characterized as a simple loan agreement. Mr. Stephenson argues that we should adhere to the reasoning of the trial court, and construe both agreements against Mr. Caldwell. He insists that the case should be controlled by the principle which he calls *Contra Proferentum:* that is, when a contract is ambiguous, it is generally construed against the party who drafted it. *Parks v. Richardson,* 567 S.W.2d 465, 468 (Tenn. Ct. App. 1977), *Hanover Insurance Company v. Haney*, 425 S.W.2d 590, 592-93 (Tenn. 1968).

This rule is a valid and useful tool for construing ambiguous contracts, and it has frequently been used by the courts as the key to resolving the question of which of two possible constructions of a contract to favor. But it does not trump other rules of construction in all situations. Above all, it does not negate the actual intention of the parties, where that can be deduced from other evidence.

Mr. Caldwell cites a number of cases from the federal courts which state that the rule of resolving contract ambiguities against the drafting party only applies if the interpretation urged by the non-drafting party is reasonable and practical. The same principle has been articulated by this court several times, quoting the same words from 12 Am.Jur. 792 Contracts, § 250: "Where the language of an agreement is contradictory, obscure or ambiguous, or where its meaning is doubtful so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." *Wilkerson v. Williams* 667 S.W.2d 72, 79 (Tenn. Ct. App. 1983); *Pettyjohn v. Brown Boveri Corp.*, 476 S.W.2d 268, 272 (Tenn. Ct. App. 1971); *Zager,* 363 S.W.2d at 519; *Commerce Street Company Inc. v. Goodyear Tire and Rubber Company, Inc.*, 215 S.W.2d 4, 11 (Tenn. Ct. App. 1948).

Mr. Caldwell points out that treating his transaction with Mr. Stephenson as a simple loan would lead to results that are inconsistent with a reasonable business decision on his part. He demonstrates this by describing the outcome for both parties under two possible scenarios. If Knight's Enterprises succeeded, Stephenson would enjoy a 70% return on his money, and Caldwell would break even on the transaction. If Knight failed, Caldwell would still be obligated to repay Stephenson's money plus 70%, on top of his own losses. Under both scenarios, Caldwell would take all the risk and Stephenson would reap a substantial reward. Surely, he argues, no rational businessman would enter into such an agreement.

When the meaning of an agreement is ambiguous, and the court attempts to determine the true intentions of the parties, it should favor the construction that furnishes reasonable terms for the parties' agreement over the construction that results in unreasonable terms. However, we need not rely on that principle to reach a decision herein. The documents and, particularly, the parties' testimony provide a clear basis for determining their intent. After thoroughly reviewing the documents in dispute, the testimony of the parties, and the entire record of this case, we conclude

7

that the parties intended their transaction to be an investment contract.  Mr. Stephenson joined with other investors in a potentially lucrative venture, which was by no means risk-free, and he is not entitled to repayment.

## IV.

The judgment of the trial court is reversed.  The case is remanded to the Circuit Court of Robertson County for further proceedings consistent with this opinion.  Costs on appeal are taxed to the appellee, James Stephenson.

_____
PATRICIA J. COTTRELL, JUDGE