IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 23, 2003 Session

## EDWIN BOOTH v. FRED'S, INC.

**A Direct Appeal from the Circuit Court for Shelby County**
**No. CT 000227-01     The Honorable D'Army Bailey, Judge**

**No. W2002-01414-COA-R3-CV - Filed August 19, 2003**

Defendant-employer terminated plaintiff-employee for cause based on plaintiff's negligent performance of executive duties. Plaintiff-employee sued employer for benefits due under employment contract and certain pension plans. Issues at non-jury trial included whether termination was for cause and the effective date of termination. The trial court awarded plaintiff damages pursuant to the employment contract finding, in part, that employer failed to comply with employment contract provision requiring written notice of termination at least 90 days prior to termination for cause. Trial court also awarded plaintiff benefits under two stock option plans. Defendant employer appeals. We affirm in part and reverse in part.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. joined; HOLLY M. KIRBY, J., dissents in part with separate opinion.

Charles W. Hill, Memphis, For Appellant, Fred's, Inc.

Stephen W. Vescovo, Timothy R. Johnson, Memphis, For Appellee, Edwin Boothe

**OPINION**

This case involves an action for breach of an employment contract. Defendant Fred's Inc. ("Fred's") is a Tennessee corporation that operates discount general merchandise stores in 11 southeastern states and "also markets goods and services" to franchised stores. Prior to his termination in November 2000, plaintiff Edwin Boothe ("Boothe") was an employee of Fred's, in some capacity, for nearly 25 years.

On February 1, 1998, Boothe was promoted to the position of Chief Operating Officer. That same day, plaintiff and defendant entered into a written Employment Agreement setting forth the

terms, conditions, and obligations governing Boothe's employment as Chief Operating Officer.[1]  The agreement specified that Fred's promoted Boothe to serve as its Chief Operating Officer for an initial term of two years, subject to automatic renewal for additional one-year terms "unless either party shall have given to the other written notice of termination at least six (6) months prior to the end of the then current term (which termination shall become effective at the end of the then current term)." Under the agreement, Boothe was to receive a compensation package including an annual base salary beginning at $120,000.00, a yearly bonus of at least $20,000.00, qualified stock options pursuant to an Incentive Stock Option Agreement, a conditional award of 2,500 shares of Common Stock pursuant to a Restricted Stock Award Agreement, and certain health and medical benefits.

Boothe's duties as Chief Operating Officer under the agreement included plaintiff's acknowledgment that he was to "assume primary responsibility (subject at all times to the control of the Chief Executive Officer of the Company) for matters assigned to him by the Chief Executive Officer."  According to Boothe's testimony at trial, plaintiff's duties specifically included overall responsibility for the performance of store operations, protection of the physical assets of the company's retail stores, distribution center and pharmacies, and inventory control.[2]

With regard to termination of employment, the agreement contains the following provision:

> This Agreement shall continue unless and until terminated, (i) with or without cause, by written notice of termination as provided in Section 1 above, (ii) by either party for cause, upon not less than ninety (90) days prior written notice to the other (except that such notice of termination may be (x) effective immediately in the case of termination by Company for acts of Executive involving moral turpitude or breach of duty of loyalty, or (y) effective in ten (10) days in the case of termination by Executive for cause, or (iii) as otherwise provided herein.

---

[1] Boothe was one of only a handful of Fred's officers with a written Employment Agreement.

[2] Fred's President John Reier described Boothe's duties on the "operations side of the company" as follows:

> Well, the operations side – the first thing would be checking in the freight to make sure the freight shipments from the distribution center to the store were received correctly.  The second thing would be guarding the assets in the store to see that cashiers or any other employees weren't stealing or that customers weren't stealing.  So the main thing on the store operating side as far as on the sales floor would be protecting the company's assets, and on the backside, receiving merchandise correctly.

Cause justifying termination, for purposes of the Employment Agreement, was defined to include acts of misconduct or negligence on behalf of an executive in the performance of his employment duties, or an executive's violation of his duty of loyalty to Fred's. Duty of loyalty is not defined in the agreement.

As a retail merchandise business, Fred's is forced to deal with and account for inventory shrinkage. Shrinkage, with regard to the retail merchandise industry, "is a term of art applied to describe losses of merchandise caused by employee or customer theft, clerical error due to mis-shipment, transfers of goods not being recorded, damages not being recorded, and markdowns not being recorded." Plaintiff explains that shrinkage "represents the difference between inventory book value and actual physical inventory which can be accounted for at the actual store locations." To account for losses due to shrinkage, Fred's developed a shrinkage plan and budgeted a shrink reserve or accrual for each new fiscal year. According to defendant, "[t]he shrinkage plan is accounted for by accruing a dollar amount in the Defendant's financial reports to anticipate losses due to shrinkage." The essential effect of controlling or maintaining shrinkage below the accrual budget is an increase to defendant's annual profit.[3] As Chief Operating Officer, Boothe was responsible for monitoring shrinkage levels.

In the early months of 2000, Fred's experienced an escalation in shrinkage in January and February of 2000. The increase in shrinkage coincided with the closing of two Fred's retail stores, located in Chattanooga, Tennessee and Hixson, Tennessee respectively. Upon closing, the inventory of both stores, in keeping with the common practice of defendant, was transferred to "recipient stores." In March 2000, Chief Financial Officer Rick Witazak ("Witazak") informed Boothe that there was approximately $500,000.00 in unreconciled inventory remaining on both the Chattanooga and Hixson books.[4] According to his testimony, Boothe predicted that the remaining book inventory represented inventory that was transferred from the Chattanooga and Hixson stores to one or several recipient stores that, upon receipt, failed or neglected to submit the proper paperwork to account for the transfer and receipt.

Based on these observations, Boothe and Witazak decided to delay an inventory of the Chattanooga and Hixson stores until inventories of the suspected recipient stores were completed. The rationale for this decision was to first determine the inventory totals for the recipient store(s), and then compare these totals with the amount of inventory on the books of the two closing stores.

---

[3] In its brief, defendant explained:

> The Defendant sets aside "shrinkage" reserves as best estimates to account for potential losses due to shrinkage. Shrinkage affects the Defendant's profitability, decreasing its earnings per share. If the Defendant can reduce its shrinkage reserve, it can show more profit in terms of earnings per share. Thus, the Company's goal is to carry as low a shrinkage reserve as possible.

[4] Witazak left Fred's in March or April 2000. Jerry Shore took over as Chief Financial Officer in April 2000.

Armed with this information, the defendant's financial office could then "reconcile the accounting records for the closed stores and report the actual shrinkage and take it off the books of Fred's." Despite these plans, no inventory of the recipient store(s) was taken; rather, the officers decided to wait until the next regularly scheduled physical inventories.

Shrinkage amounts for Fred's continued to escalate over the summer of 2000. During this time, Boothe and several other company officials engaged in weekly operations meetings at which shrink was always a topic. In June 2000, Boothe had his annual evaluation meeting with Reier. Pursuant to an Employee Data Change form approved on July 5, 2000, Boothe was awarded a merit increase, raising plaintiff's annual salary from $128,000.00 to $140,000.00.[5] Aside from the pay increase, this form reflects no other status, compensation, or benefit change.

Reier testified that throughout the summer, Boothe advised that shrinkage levels were anticipated to improve as physical inventories were taken of recipient stores. Prior to the Board of Directors meeting in August 2000, Hayes met at least twice with Boothe, Shore, and new Head of Store Operations, Charles Brunjes ("Brunjes"), to discuss the "escalation in reserve." Hayes testified that Boothe assured him during these meetings that the shrink problem was going to improve.

At the Board of Directors meeting on August 13, 2000, Hayes and Shore gave a report to the board on company shrink reserve levels. In light of the increased shrinkage, Hayes recommended to raise shrink accruals by approximately 2.34 percent. Hayes testified that he also reported to the directors that the company was in the process of conducting weekly inventory checks on 17 selected stores. However, despite these assurances, Hayes testified that he later learned that the company was not reaching its goal of 17 inventory checks per week.

In September 2000, Hayes called a meeting with Reier, Boothe, Merle McGruder, and Brunjes to further address the shrinkage problem. Shortly after the meeting adjourned, Hayes directed Boothe and Shore to prepare a shrink analysis report providing an accurate shrink projection for the balance of the fiscal year. Hayes specifically directed Boothe to "check" every single inventory, and ordered Shore to "check the number and to back up [Boothe]."

In October 2000, Boothe and Shore submitted a shrink analysis report providing positive news that the company experienced a net shrinkage pickup in the amount of $195,824.50. Hayes explained the term "pickup," stating:

> Remember when I said that we set up accruals on the books
> and we have accruals for the stores so what it suggested was that the
> accruals that we had put on the books for the stores would be less

---

[5] The parties dispute what plaintiff's July 2000 pay increase represents. Plaintiff maintains that the increase in pay reflects only an increase in salary, fully independent and apart from all bonuses owed to plaintiff under the Employment Agreement and subsequent 2003 Key Employee Incentive Plan. Defendant contends that plaintiff's pay increase was calculated to include a portion of Boothe's annual bonus.

than what we had set up for. It does not mean that we found merchandise. If we assumed that a store was going to have a two percent shrink and instead it had a one percent shrink, there would be a pickup.

On November 1, 2000, Boothe and Shore discovered that their October 2000 projection was inaccurate. Instead of a positive variance of $195,000.00, Boothe and Shore now reported a negative shrink variance of $799,000.00. Shore testified that $799,000.00 in cost represents approximately $1,100,000.00 at retail. According to Shore, the negative variance constituted a swing of approximately "$200,000 positive to an $800,000 negative or about a million dollars swing at cost." Shore further testified that he learned that the Chattanooga and Hixson stores had not been inventoried, and that the accounting records for these stores had not been adjusted for "the shrinkage or for the physical inventory that had been taken."

According to the company's December 2000 shortage report, Fred's wrote off $231,288 in retail dollars for the Chattanooga store. Fred's wrote off an additional $158,705 in retail dollars for the Hixson store. Both write-off's were the result of the company's inability to account for transferred merchandise.

Upon discovery of the negative shrink variance, Boothe and Shore immediately reported the information to Reier and Hayes. In response to this new report, Hayes ordered Reier to instruct Boothe to leave the company premises and submit to an immediate and mandatory leave of absence. Boothe was further instructed not to contact anyone at Fred's, and was temporarily banned from returning to the company or participating in board meetings. The accounting firm of Price Waterhouse was contacted to conduct an independent investigation and audit of Fred's books.

The Price Waterhouse audit confirmed that Boothe was not guilty of any dishonesty, and further verified that Boothe had not taken any money from the company. At the Board of Directors meeting on November 13, 2000, Hayes and Shore discussed the Price Waterhouse audit and the issue of shrinkage with the board. After the meeting, as a result of the unexplained escalation in shrinkage, and despite the Price Waterhouse report exonerating Boothe of criminal or dishonest conduct, Hayes determined that Boothe should no longer hold the position of Chief Operating Operator for Fred's.

Despite his desire to terminate Boothe, Hayes agreed to offer Boothe a new position as Executive Vice President in charge of real estate and distribution, on Reier's recommendation. This new position included a decrease in job duties, a reduced annual salary of $120,000.00, and stock options. Reier proposed the new offer to Boothe at a lunch meeting on or around November 10, 2000. Without Reier's knowledge, and in violation of an existing company policy that prohibited the recording of any "in-person conversation and/or telephone conversation of any other employee without his/her permission unless approved in writing by one of the Executive Vice Presidents and

the Director of Personnel and the General Counsel," Boothe tape recorded the conversation.[6] On cross examination, Reier testified that he informed Boothe that if he didn't take the new position, "he would be terminated for cause."

Boothe returned to work on or around November 14, 2000, approximately one day after the November Board of Directors meeting. Boothe testified that he met with Hayes on November 14 to discuss his role in the shrinkage problem and to address several other job performance issues. Fred's new proposal was not discussed at this meeting, and Boothe testified that to this point, there had been no mention that he was being removed from his position as Chief Operating Officer.

On approximately November 16, Boothe had a telephone conversation with Reier to discuss his future with Fred's. According to Boothe, Reier told him that Hayes was "very amenable" to the prospect of Boothe leaving Fred's, with the condition that Boothe be allowed to keep his stock and severance. Later that same day, Boothe again met with Hayes to discuss Boothe's future with Fred's. Boothe testified that Hayes spelled out the terms and compensation for the new offer during this conversation. Additionally, Boothe testified that Hayes informed him that if plaintiff wished to leave the company, he could contact Fred's in-house counsel and work out a fair settlement agreement. Boothe made no decision to accept or reject defendant's offer at this time.

Three days later, Boothe met with Reier to further discuss his future with Fred's, and the terms of the new offer. On direct examination, Boothe noted that he asked Reier about the "cause issue" of his Employment Agreement. According to Boothe, Reier informed him that "he didn't think [Boothe] would be terminated for cause, that if [Boothe] was terminated, [Boothe] would be terminated for performance."

On November 20, Boothe met with Hayes and Reier to offer his decision. After learning that Fred's stood by their offer, and viewing the new position as a demotion, Boothe rejected the opportunity to stay on as Executive Vice President of real estate and distribution. Boothe was then given time to pack his belongings and exit the building. Before exiting, Boothe testified that Reier affirmed that there would likely be no issue with regard to plaintiff retaining his severance and stock.

---

[6] Violation of this policy mandated immediate dismissal of the offending employee. The evidence indicates that Boothe made five tape recordings of his meetings with Hayes and Reier from approximately November 10, 2000 until November 20, 2000.

Despite these assurances, Boothe received no salary, health benefits,[7] or stock incentives after November 20, 2000.

According to defendant's brief, Hayes "testified that he terminated the Plaintiff's employment as Chief Operating Officer because the Plaintiff breached the duties he owed the Company as one of its top officers." Among the reasons for Boothe's dismissal was his failure to properly monitor shrinkage and keep senior management accurately apprised of the escalating situation. Although other officers were disciplined for their roles in the shrinkage problem, no other officer was demoted or fired for their conduct.

In a letter dated January 8, 2001, Reier confirmed Boothe's termination, stating:

> This will confirm your termination from employment with Fred's, Inc., effective November 20, 2000 for cause and violation of your duty of loyalty to the company.

Boothe received the letter on January 9, 2001. It is undisputed that the letter of January 8, 2001 was the first written notice given to Boothe that he was being fired for cause and for breach of duty of loyalty.

Boothe maintains that throughout his November 2000 conversations with Reier, Reier indicated that plaintiff was not being terminated for cause. Reier confirmed these assurances, but further testified that he informed Boothe that if plaintiff "didn't take the other job, he would be terminated for cause." On cross examination, Hayes acknowledged that there was no mention of "termination for cause" on plaintiff's tape recording of the November 20 meeting.

With regard to defendant's allegations of breach of duty of loyalty, Boothe maintains that he first learned of said allegations upon his receipt of the January 8 termination letter. In his testimony before the trial court, Reier admitted that there had been no mention of breach of duty of loyalty prior to January 8, to his knowledge. Hayes testified that he mentioned breach of duty of loyalty to Boothe during a November meeting with Boothe, but admitted that his assertions were not recorded on any of the tapes that he had heard.

---

[7] In late November 2000, Boothe took his son to the hospital for surgery. Boothe testified that the hospital called the company's insurance carrier to verify coverage and was told that Boothe no longer had an insurance policy through Fred's. Boothe called Reier in search of an explanation, and Reier in turn contacted the company's in-house counsel. Reier was informed that Boothe's insurance had been cancelled upon termination on November 20, 2000, and he relayed this information to Boothe in a return phone call. Reier advised Boothe to take out a COBRA policy to cover his son's medical expenses. Boothe testified that he was required to pay a pro-rated portion of the $292.62 monthly COBRA charges for the months of November and December 2000. Boothe further noted that he continued to pay monthly COBRA premiums until he was hired at his new job in May 2001.

On January 12, 2001, Boothe filed a Complaint for Breach of Contract against Fred's. Pursuant to this complaint, Boothe asserted that he "fully complied with all of his duties and obligations as Chief Operating Officer," and alleged that Fred's failed to comply with the 90-day written notice provision set forth in the Employment Agreement, governing termination with or without cause. Boothe specifically alleged the following material breaches on behalf of defendant:

> a.. Defendant has failed to continue to pay plaintiff his annual base rate of compensation of One Hundred Forty Thousand Dollars ($140,000.00).
>
> b. Defendant has failed to provide plaintiff and his family the same benefits to which other executives and their families are entitled as employees of the company, including health insurance benefits, life insurance benefits, vacation, and use of company automobile.
>
> c. Defendant has failed to recognize plaintiff's entitlement to an annual minimum bonus of Twenty Thousand Dollars ($20,000.00) for the remaining term of the contract.
>
> d. Defendant has failed and refused to provide or allow plaintiff to purchase and/or exercise his rights pursuant to certain Incentive Stock Option Agreements and Restricted Stock Award Agreements as incorporated in plaintiff's Employment Agreement and for which plaintiff is a party to said contracts with defendant.
>
> e. Defendant has breached its contract with plaintiff by failing and refusing to pay plaintiff his salary which was earned prior to the attempted termination and continuing through the date that defendant formally tendered plaintiff a written notice of termination in early January, 2001.

Based on these allegations of breach, Boothe sought damages to include payment of his annual base rate of compensation and annual minimum bonus, continuation of company benefits, including health insurance, an "award of any and all qualified stock options to which [Boothe] is entitled under the Stock Option Agreements and Restricted Stock Award Agreements," punitive damages, and reasonable attorney's fees.

Fred's filed an Answer on February 13, 2001 seeking dismissal of plaintiff's Complaint to the extent that it inappropriately sought punitive and exemplary damages in an action for breach of contract. On June 12, 2001, Fred's filed an Amended Answer admitting that Hayes invited Boothe to "contact the company's attorney to discuss issues related to his severance," and raising allegations that "Plaintiff secretly tape recorded conversations with members of management in violation of

express company policy of which the Plaintiff was aware and that such secret tape recording constitutes "cause" for termination as defined in the Plaintiff's employment agreement." In support of these allegations, defendant attached the Affidavit of Michael Hayes, in which Hayes stated:

> I have been advised by my counsel that during November 2000 shortly before Mr. Boothe's discharge from employment, he tape recorded five separate conversations had with either me or John Reier. Mr. Boothe did not have permission to tape record any conversation with me nor any conversation with Mr. Reier. Had I been made aware of the fact that Mr. Boothe was tape recording our conversations regarding his work performance, I would have immediately terminated his employment for misconduct.

On November 20, 2001, Fred's filed a Motion for Summary Judgment, seeking judgment as a matter of law on the basis that plaintiff's conduct in tape recording conversations constituted cause for termination.[8] Defendant further asserted that Boothe "committed acts of negligence in the performance of his employment duties and which amount to violation of his duty of loyalty to the company. As a matter of law, such conduct amounts to cause for termination as defined by the Plaintiff's employment agreement."

On January 17, 2002, Fred's filed a Motion to Strike Boothe's claim for punitive damages. That same day, plaintiff filed his own affidavit, setting forth the following assertions of fact:

> 10. On or about November 20, 2000, I met with Mr. Hayes and John Reier, President of the defendant. At that time, Mr. Hayes indicated that I had two choices: take the new position (demotion) or leave the company and "we" would reach a "fair settlement."

> 11. When I refused to accept the demotion, Mr. Hayes immediately terminated my employment with the company. He further instructed me to meet with the company attorney, Sam Chafetz, to "work out the details of my severance package."

> 12. On or about November 23, 2000, John Reier called me at my home and indicated that if I did not accept the severance package that had been discussed (which was far less than I was entitled to under my Employment Agreement), then he believed Mr. Hayes

---

[8] Boothe justified his conduct with the assertion that the tape recorded conversations took place after the defendant had already "engaged in a scheme to defraud plaintiff of his rights under the Employment Agreement." Moreover, Boothe denied knowledge of the defendant's policy prohibiting unauthorized tape recordings, and further challenged defendant's assertion that plaintiff would have been fired for such conduct.

would pursue the "for cause" provision in the Employment Agreement.

13. At no time during this meeting with Mr. Hayes and Mr. Reier or during any prior meetings, did either individual state that I was being terminated "for cause" as that term is used in my Employment Agreement.

14. Further, during one of the meetings in November, 2000, Mr. Hayes acknowledged that the defendant was not attempting to invoke the "for cause" section of the Employment Agreement.

15. It was not until I received the written Notice of Termination letter dated January 8, 2001, from the president of the company, John Reier, that I learned for the first time that the defendant was alleging I had violated my "duty of loyalty" to the company. The Employment Agreement requires written notice of termination to effectively terminate employment.

In February 2002, Fred's filed a Motion for Interlocutory Appeal seeking application of the doctrine of after acquired evidence for the purposes of establishing misconduct on behalf of Boothe for the unauthorized tape recording of several conversations. On February 15, 2002, the trial court entered an Order denying Fred's Motion for Summary Judgment. Soon thereafter, the trial court entered a second Order denying Fred's Motion for Interlocutory Appeal.

On February 18, 2002, the parties entered a Stipulation conceding that Boothe's February 1, 1998 Employment Agreement was written and prepared by defendant. A non-jury trial was held from February 18, 2002 through February 28, 2002. On April 16, 2002, the trial court filed its Findings of Fact and Conclusions of Law.

The trial court found that Boothe was terminated for cause and further determined that plaintiff "committed acts of "misconduct and/or negligence in the performance of the duties of his employment" as those terms are used in the Employment Agreement dated February 1, 1998." Despite this ruling, the trial court found that Boothe did not violate his duty of loyalty to Fred's, and thereby concluded that defendant failed to give the required 90-day written notice of termination for "cause due to reasons other than breach of duty of loyalty." In addition to these holdings, the court found that Boothe was an employee of Fred's through April 9, 2001, as the 90-day termination period did not begin until January 9, 2001, the date written notice was first received.

The trial court further determined that Boothe's annual salary was $140,000.00, and that no salary or benefits were received after November 20, 2000. The court calculated plaintiff's salary award at $54,055.55, covering his salary for the time period spanning November 20, 2000 through April 9, 2001. With regard to other benefits and compensation entitlements, the court found:

8. That plaintiff is entitled to reimbursement of his health insurance premiums which he paid in the amount of $292.63 per month for COBRA coverage plus partial payment for coverage for the month of November, 2000 in the amount of $97.54, and partial payment through April 9, 2001 in the amount of $87.78, for a total award of $1,355.84.

9. That the plaintiff cannot exercise Incentive Stock Option Agreement dated February 2, 1998 because the Court finds that the defendant failed to achieve its plan for the third year of the grant (target earnings per share of $1.28 for the fiscal year 2000 at the time this Option Agreement was granted).

10. That having found that plaintiff continued to be an employee of the defendant until April 9, 2001, the restrictions on the shares of stock awarded by the Restricted Stock Award of February 28, 1996 lapsed and plaintiff's rights to those shares vested. After the three stock splits which took place after the said Restricted Stock Award was granted, said grant now is for 4,099 shares and plaintiff is entitled to these shares pursuant to the Restricted Stock Award Agreement.

11. That plaintiff is entitled to the dividends issued from the Restricted Stock Award Agreement since November 20, 2000.

12. That plaintiff was an employee of the company at the time the first third of the shares represented by the Incentive Stock Option Agreement granted March 2, 2000 vested. That the company made its "plan" for fiscal year 2000 under the 2000 Plan, and the plaintiff's "plan" was the same as the company "plan" for fiscal year 2000 under the 2000 Plan. Further, after adjusting for the two stock splits which occurred after the plan was put into effect, the plaintiff would be entitled to exercise this Incentive Stock Option to purchase up to a total of 8,124 shares at the new exercise price of $7.92 per share.

*****************************************************

15. That the plaintiff was a participant under the "2003 Key Employee Incentive Plan." That the plaintiff was entitled to a separate bonus pursuant to [this plan] in lieu of the minimum annual bonus of $20,000 set forth in the Employment Agreement of Edwin Boothe. For the year 2000, defendant achieved its corporate goal as

-11-

set forth in said Plan, entitling plaintiff to 26 bonus pool plan "points" which entitled plaintiff to a bonus of $52,000.

16. That the plaintiff is not entitled to attorney fees as set forth in the Employment Agreement for having to initiate this litigation to enforce the terms of this Agreement because the Court finds both parties to be in breach of the Employment Contract.

Upon entry of the trial court's Findings of Fact and Conclusions of Law, both parties filed motions seeking discretionary costs. Additionally, Boothe filed a Motion for Prejudgment Interest. On May 15, 2002, the trial court entered an Order on Judgment, providing in pertinent part:

The Court having heard all of the evidence of the parties, examined the exhibits introduced in trial, and having heard arguments of the parties, and from the entire record in the cause, finds that the defendant breached the notice of termination provisions in the Employment Agreement with plaintiff and that plaintiff, Edwin Boothe, is entitled to damages of $54,055.55 representing past-due salary, $1,355.84 for reimbursement of health insurance premiums, and to an additional sum of $52,000.00 representing plaintiff's bonus for fiscal year 2000 which was earned by plaintiff but not paid by defendant.

Further, the Court holds that the plaintiff is awarded a judgment for 4,099 shares of stock pursuant to the Restricted Stock Award dated February 28, 1996.

Further, plaintiff is entitled to the dividends from the 4,099 shares of stock from the Restricted Stock Award dated February 28, 1996 through the entry of this Order and is awarded judgment in the total amount of $737.82, and such additional dividends as may accrue.

Further, the Court awards plaintiff a judgment holding the plaintiff is entitled to exercise the Incentive Stock Option Agreement granted March 2, 2000 to purchase the first one-third of the shares awarded up to a total of 8,124 shares at the exercise price of $7.92 per share.

That same day, the court filed an Order denying Boothe's motions for prejudgment interest and discretionary costs, and further denying defendant's motion for discretionary costs.

Fred's filed a Notice of Appeal and moved for entry of an order staying execution of the trial court's May 15, 2002 judgment pending appeal. On appeal, Fred's presents the following issues for review, as quoted from defendant's brief:

1. Did the trial court err in concluding that the Plaintiff did not violate the duty of loyalty set forth in the employment agreement sued upon?

2. Did the trial court err in denying summary judgment to the Defendant by declining to consider after acquired evidence of misconduct and breach of duty of loyalty to establish cause for termination of the employment agreement?

3. Did the trial court err in finding and concluding that the Plaintiff was an "employee" of the Defendant through April 9, 2001?

4. Did the trial court err in finding and concluding that the Plaintiff is entitled to be granted the shares of stock and dividends awarded in the Restricted Stock Award Agreement of February 28, 1996?

5. Did the trial court err in finding and concluding that the Plaintiff is entitled to exercise an option to purchase one-third of the shares granted in the Incentive Stock Option Agreement of March 2, 2000?

6. Did the trial court err in concluding that Plaintiff was entitled to payment of salary and reimbursement of COBRA insurance premiums through April 9, 2001?

7. Did the trial court err in finding and concluding that the Plaintiff was entitled to a salary bonus of $52,000.00 for his work performance during the year 2000?

Plaintiff Boothe asserts two additional issues for review, as quoted from his brief:

Whether the trial court erred in holding that Boothe was terminated by Defendant for cause.

Whether the trial court erred in denying an award of attorney's fees to Boothe as the prevailing party as set forth in the Employment Agreement.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless

the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

## I.

Recognizing that the issues presented by defendant and plaintiff regarding "cause for termination" and "breach of duty of loyalty" are both tied to an interpretation or analysis of the termination provisions and definitions contained within the Employment Agreement, we will consider these issues as separate parts to a single question. Beginning with plaintiff's issue of whether the trial court erred in holding that defendant had cause to terminate Boothe from his position as Chief Operating Officer, we find that the evidence in the record support's the court's ruling that plaintiff was negligent in the performance of the duties of his employment.

Section 5(a) of the Employment Agreement provides that the agreement can be terminated by either party for cause. "Cause" is defined in section 5(e) to include:

> (i) conviction for a felony;
> (ii) refusal to perform the duties of [executive's] employment;
> (iii) misconduct or negligence in the performance of the duties of [executive's] employment; or
> (iv) violation of [executive's] duty of loyalty to Company.

The trial court determined that Fred's was justified in dismissing Boothe for cause based on its finding of negligence on plaintiff's behalf. In his comments from the bench, the judge offered several reasons in support of his finding of negligence or misconduct. The court noted that Boothe was negligent in failing to expedite inventories of the Chattanooga and Hixson stores, or apprise senior management of the missing inventory, despite knowledge of the problem as early as March 2000. The trial court admonished Boothe for allowing Hayes to discuss the company's shrink accruals with the Board of Directors at the August 2000 meeting without the full benefit of Boothe's knowledge of the escalating shrinkage problem. The court further found that Boothe was negligent in his failure to inform Reier of the unreconciled Chattanooga and Hixson inventory until November 1, 2000, especially in light of Reier's July 2000 evaluation of Boothe in which Reier commented that plaintiff needed to make a concerted effort to keep management apprised of important business developments. Finally, the court cited to several unrelated acts of negligence, including Boothe's failure to monitor the company's supply account.

The term negligence is not defined in plaintiff's Employment Agreement. A common law cause of action for negligence requires proof of the following elements:

> (1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.

-14-

***Roe v. Catholic Diocese of Memphis, Inc.***, 950 S.W.2d 27, 31 (Tenn. Ct. App. 1996) (citing ***McClenahan v. Cooley***, 806 S.W.2d 767, 774 (Tenn. 1991)).

Although the case at bar does not involve a common law negligence action, we find that the above factors are nonetheless applicable to defendant's argument that Boothe breached the Employment Agreement by engaging in negligent conduct.

Considering first the element of duty of care, we note that Section 2 of the Employment Agreement generally defines the scope of Boothe's duties as Chief Operating Officer of Fred's. Section 2 states in pertinent part:

> As COO, Executive shall have and agrees to assume primary responsibility (subject at all times to the control of the Chief Executive Officer of the Company) for matters assigned to him by the Chief Executive Officer. In the performance of such duties, Executive agree to make available to Company all of his professional and managerial knowledge and skill and all of his gainful time in order to properly fulfill his duties.

It is undisputed that in his role as Chief Operating Officer, Boothe had overall responsibility for the performance of store operations, including a primary duty to protect the physical assets of the company. Hayes testified that Boothe failed to protect the physical assets of the company, and that such failure thereby constituted an act of negligence in breach of the Employment Agreement. Hayes explained Boothe's negligent conduct as follows:

> Well, negligence was not properly supervising his personnel and seeing to it that the paperwork was being funneled to the financial department on the capital account. That's one form of negligence.
>
> In the case of this, not going back immediately with those store closes and instantly saying, okay, we have missing inventory here, the RIPs are showing me the inventory is gone. Going to the regional director and saying to the regional director, listen, I want all the inventories taken right now of the stores that we believe this inventory went to and walk over to the CFO and say take any overages and accrue them because we have this write-off that will surely occur. It's another form of negligence.
>
> Failing to follow specific directions, which he was more than capable of doing. I don't know, it's just plain misconduct and breach of duty of loyalty.
>
> Q: And when you say failing to follow specific directions, you're referring to?

A:      I was giving two very, very specific directions. One, he knew how to go out and do an evaluation as to whether everything was on that report. He knew the district managers and regional managers had methodology of slowing down inventories, but the inventories had been taken so the information was there. It could be at the regional level. It could be at the district manager level, but it was there if you wanted to get it.

Reier testified that he considered Boothe responsible for the "surprise" report of November 1, 2000 that plaintiff's October 2000 shrink projection was inaccurate, and confirmed his belief that Boothe had a significant role in the company's escalating shrinkage. Moreover, Reier noted that Boothe failed to comply with the industry "rule" that inventories are always taken of closed retail stores before merchandise is transferred to another location. Had Boothe inventoried the stores in compliance with the industry "rule," Fred's would have known how much inventory was in each particular store, thereby avoiding unreconciled shrinkage. According to Reier, the unreconciled shrinkage at the Chattanooga and Hixson stores forced Fred's to substantially raise shrinkage reserves or accruals, thereby cutting into the company's profit margin.

Boothe admitted that his primary goal as Chief Operating Officer was to control inventory numbers in the retail stores, and that the only way to totally verify inventory is to take a physical inventory of the merchandise in the store. Plaintiff further acknowledged that it is "business practice" to reconcile inventory on closed stores within 60 to 90 days of the closing date. Boothe testified that had he accelerated the inventories of the recipient stores, the increased shrinkage would have been reported earlier, thereby ensuring a more accurate financial picture for the company. We quote from Boothe's cross examination testimony before the trial court:

Q: And you have acknowledged, haven't you, that if you did something wrong in your mind in this case, it's that you didn't set a priority to inventory those stores in the district where the goods were transferred from Chattanooga and Hixson?

A: You mean to accelerate them?

Q: Yes.

A: Yes.

Q: Had you accelerated those inventories into the first quarter of the year or the second quarter of the year, then this additional shortage problem would not have been reported in the third quarter?

A: It would have been reported earlier, yes.

Q: And you would have – had you reported it earlier, then you would have had a more accurate financial picture of what was going on in the company earlier in the year, true?

A: Yes.

Q: And I believe your words were that you hadn't been on it to the extent you should have been, meaning to expedite those inventories, true?

A: I don't remember my exact words, but I did not expedite the inventories.

Q: Well, I've heard the tapes, and if I tell you without playing the tapes that you said in the discussion with Mr. – in the November 14 tape that the problem is the goods were transferred without inventories and that you hadn't been on it to the extent you should have been, do you disagree with that statement?

A: It was my responsibility to make sure everything in the stores was run within the guidelines.

From the testimony in this case, it is apparent that Boothe, as Chief Operating Officer, had a duty to protect and control the inventory in the retail stores. It is also apparent that Boothe had a duty to provide an accurate account of the shrinkage problem to senior management, a duty plaintiff breached by failing to expedite or perform inventories of recipient stores in accordance with Hayes' directions.

In breaching this duty, Boothe failed to notify Hayes or Reier of the fact that approximately $500,000.00 (retail dollars) remained on the books of both the Chattanooga and Hixson stores. Ultimately, Fred's was forced to write-off roughly $400,000.00 in shrinkage, representing transferred inventory that could not be located. This $400,000.00 write-off cut directly into the company's annual profit margin.

Based on the above conclusions, we find that Boothe engaged in negligent conduct in direct violation of his Employment Agreement. Boothe's negligent conduct thereby provided defendant with just cause for termination of plaintiff's employment as Chief Operating Officer.

Finding that Boothe was guilty of negligent conduct in breach of his Employment Agreement, we must now consider defendant's issue of whether the trial court erred in finding that plaintiff did not breach his duty of loyalty to Fred's.

-17-

We begin by noting that the contract, as drafted by Fred's, does not define the nature of conduct that rises to a breach of duty of loyalty. Hayes explained breach of duty of loyalty as follows:

> Q: Explain what you mean by breach of duty. Tell me how you consider Mr. Boothe to have breached any duty owed the company, or you, for that matter.
>
> A: Anybody who is an officer of a company, and particularly when you are the number two man or number three man in a company of 9,000 employees, is held to a higher standard. There's no question about that. When you talk about what does duty of loyalty mean, what it means is that you will preserve, protect, enhance the assets of a company. You will protect its reputation and you will follow out the legal orders of your supervisors.
>
> Q: How did Mr. Boothe fail you in those respects?
>
> A: He failed to follow directions. He failed to follow the orders that I gave him, all of which were legal. He did not protect the reputation of the company. He knew that I was giving information to the board of directors based upon the information he had given me.
>
> The most defined thing that had occurred was that he was aware in March and April when we were going through the capital accounts, he was aware that this company had $400,000 worth of fictitious assets on the book, and he did nothing about it.

Reier defined breach of duty of loyalty in his testimony as a duty "[t]o keep the company out of harm's way by informing everybody of certain circumstances that might disrupt the profitability of the company or the legalities of the company or compromise it in any form or shape."

Based on this Court's understanding and interpretation of traditional breach of duty of loyalty situations, we are unable to accept the definitions and explanations put forth by Hayes and Reier in their testimony before the trial court. We equate breaches of duty of loyalty with the acts of a traitor. Traditional examples of breaches of loyalty duties in the employment context include acts of an employee in direct competition with the financial, proprietary, or business interests of an employer, thereby placing the personal interests of the employee before those of the employer, the sale or distribution of employer's protected trade secrets, and a myriad of other destructive acts amounting to more than mere mistaken judgment or negligence. Breaches of loyalty are most often intentional, destructive acts completed explicitly for the employee's own self-interests, in direct violation or competition with the interests of an employer.

The explanations or definitions provided by Hayes and Reier are couched largely in terms of negligence. Undoubtedly, Boothe, as Chief Operating Officer, had a duty to protect the assets, financial interests, and reputation of the company. However, there is no evidence in the record to indicate that Boothe intentionally placed his interests before those of the defendant in failing to control, monitor, or report the escalating shrinkage. While it may be true that Boothe's failure to adequately perform these duties could have led to non-renewal of his Employment Agreement had defendant been aware of his negligence in August 2000, we do not find sufficient evidence in the record to indicate that Boothe intentionally withheld damaging information (i.e., escalating shrinkage) for the purpose of ensuring renewal of his contract.

Moreover, this Court is perplexed by the defendant's decision to offer Boothe a new position as Executive Vice President of real estate and distribution, considering the company's allegations that Boothe was disloyal to defendant. Acts of disloyalty, in this Court's eyes, amount to the most devastating and egregious violations of an employer's trust. In light of the obvious severity of an executive's breach of duty of loyalty, we are unable to reconcile the defendant's decision to offer Boothe a new position rather than opt for immediate termination as permitted under the Employment Agreement. For these reasons, we find that the trial court correctly held that Boothe did not violate his duty of loyalty to Fred's.

## II.

The next issue presented for review by defendant is the question of whether the trial court erred in "denying summary judgment to the Defendant by declining to consider after acquired evidence of misconduct and breach of duty of loyalty to establish cause for termination of the employment agreement." Having determined in the previous section that Fred's had cause to terminate Boothe on the basis of his negligent conduct, consideration of defendant's issue hinges solely on the question of whether the tape recordings made by plaintiff, in violation of company policy, should have been considered as evidence sufficient to justify immediate termination for breach of duty of loyalty.

To briefly recount the pertinent procedural history, Fred's first learned of the existence of the secret tape recordings during discovery on Boothe's breach of contract action. On June 12, 2001, Fred's filed an Amended Answer including the following affirmative defense:

> Pleading alternatively, the Defendant alleges that the Plaintiff secretly tape recorded conversations with members of management in violation of express company policy of which the Plaintiff was aware and that such secret tape recording constitutes "cause" for termination as defined in the Plaintiff's employment agreement barring the Plaintiff from any recovery in this cause.

Fred's was permitted to amend its original Answer to include the above "cause defense." On November 20, 2001, Fred's filed a Motion for Summary Judgment, alleging in part:

-19-

The material undisputed facts show that the Plaintiff surreptitiously tape recorded conversations with members of Defendant's executive management in violation of express company policy. As a matter of law, such conduct constitutes cause for termination as defined in his employment agreement.

The trial court denied defendant's motion in an Order filed February 15, 2002, stating that the motion was not "well-taken and should be denied."

On February 7, 2002, Fred's filed a Motion for Interlocutory Appeal, appealing the trial court's Order denying defendant's Motion for Summary Judgment. In support of this motion, Fred's noted that "[t]he determination to apply after acquired evidence to defeat a breach of contract claim is a matter of first impression under Tennessee common law," and further explained:

The trial court denied the Plaintiff's Motion for Summary Judgment declining to permit the Defendant to introduce after acquired evidence of misconduct to defeat the Plaintiff's breach of contract claim.

Defendant's Motion for Interlocutory Appeal was subsequently denied by the trial court in an Order filed February 18, 2002. All of these pleadings and orders were entered prior to trial.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id*. In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id*. at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

The doctrine of newly discovered evidence provides:

> Generally, in order for a party to obtain a new trial based on newly discovered evidence, it must be shown that the evidence was discovered after the trial, that it could not have been discovered earlier with due diligence, that it is material and not merely cumulative or impeaching, and that the evidence will probably change the result if a new trial is granted. 20 Tennessee Jurisprudence, *New Trials* §§ 6, 7, 8, 9 and 10.

*Estate of Hamilton v. Morris*, 67 S.W.3d 797, 797-98 (Tenn. Ct. App. 2001) (quoting *Crain v. Brown*, 823 S.W.2d 187, 192 (Tenn. Ct. App. 1991)).

In the instant case, defendant relied upon the newly discovered evidence of the tape recorded conversations, not for the purpose of obtaining a new trial, but rather as the basis for a summary judgment motion seeking judgment as a matter of law with regard to Boothe's breach of contract action. Therefore, because the original trial in this matter had yet to commence, we find that the doctrine of newly discovered evidence is inapplicable to the situation at bar. However, because Fred's made all reasonable efforts to introduce claims and defenses based upon this evidence prior to trial, we find it necessary to consider whether the trial court properly refused to consider the tape recorded conversations.

The evidence is undisputed that Boothe tape recorded several conversations with both Hayes and Reier, without authorization or the necessary prior approval, and in direct violation of company policy. On November 30, 1992, Fred's instituted the following policy prohibiting unauthorized tape recordings:

### RECORDING CONVERSATIONS

> No employee is permitted to record and/or tape an in-person conversation and/or telephone conversation of any other employee without his/her permission unless approved in writing by one of the Executive Vice Presidents and the Director of Personnel and the General Counsel.

> Violation of this policy will result in immediate dismissal.

Defendant's argument in favor of consideration of the recorded evidence is premised on the company's belief that violation of established company policy constitutes a breach of duty of loyalty. Defendant's assertion is best summarized in the following passage from its brief:

> The Plaintiff owed a duty of loyalty to the Defendant to not violate its policies precluding the secret tape recording of conversations taking place at work. However, even absent a policy expressly precluding secret tape recording, under no set of circumstances could the Plaintiff be said to have acted out of loyalty to the Defendant when tape recording the president and its chief executive officer in discussions over Plaintiff's job performance. Here again the Plaintiff placed his self interest ahead of the Company's interests.

For the following reasons, we find that the trial court did not err in declining to consider the tape recorded conversations as evidence of misconduct and breach of duty of loyalty. We begin by noting that the trial court did not offer any explanation for his refusal to consider evidence of the tape recorded conversations. Regardless, we find no case law to support defendant's base assertion that violation of established company policy necessarily constitutes a breach of duty of loyalty. Moreover, it is apparent that Boothe's motives for tape recording his conversations with Hayes and Reier were to protect against possible future misrepresentations, and not to use such evidence to blackmail, harass, or injure defendant. In his brief, Boothe advances the following explanation for his actions:

> The purpose of the tapes was to prevent defendant from misrepresenting or even lying about defendant's grounds for terminating plaintiff.... The tapes eliminated any such possibility that Hayes or Reier would stray from the truth.

> Plaintiff submits the trial court correctly observed that all Mr. Boothe was attempting to do was protect himself in the future if the company attempted to claim it was not obligated under Mr. Boothe's employment contract. There is no evidence in the record that the tapes were shared with any other employee of the company, nor did they cause loss or harm to Fred's.[9]

Under the specific facts of this case, we find that Boothe's motives for tape recording conversations with company officials, and his subsequent acts of taping such conversations, do not amount to a breach of duty of loyalty. While this Court certainly does not condone plaintiff's

---

[9] We note that the trial court, in responding to plaintiff counsel's stated intent to ask Boothe about his motives for making the tape recordings, determined that at that point in trial, testimony regarding Boothe's motives did not appear relevant.

conduct, we note that Boothe was motivated purely by a desire to protect against the potential of future misrepresentations, and not to infringe upon or interfere with the rights of defendant.

Additionally, we recognize that defendant's summary judgment motion, and Hayes's Affidavit in support of said motion, both fail to explicitly assert that Boothe's acts of tape recording conversations with company officials constituted a breach of duty of loyalty. Defendant's motion alleges that Boothe's conduct constituted cause for termination as defined in the employment agreement, but fails to delineate whether this conduct constitutes misconduct or a breach of duty of loyalty. Despite defendant's failure to specify whether Boothe's conduct amounted to misconduct or breach of duty of loyalty, Hayes, in his affidavit, stated that "[h]ad I been aware of the fact that Mr. Boothe was tape recording our conversations regarding his work performance, I would have immediately terminated his employment for *misconduct*." (emphasis added). In recognition of Hayes's statement and defendant's failure to explicitly assert a breach of duty of loyalty claim with regard to the acts of tape recording, we conclude that defendant originally intended to introduce the tapes as evidence of misconduct rather than breach of duty of loyalty. As there is sufficient evidence in the record to support a finding of cause for termination on the basis of negligence, we find that the trial court did not err in refusing to consider further evidence of misconduct.

Moreover, we find that the following allegation from defendant's summary judgment motion, specifically asserting that Boothe's "negligent" conduct amounted to a breach of duty of loyalty, supports our finding that defendant did not originally base its theory of breach of duty of loyalty on Boothe's "surreptitious" tape recordings:

> The material undisputed facts show that the Plaintiff committed acts of negligence in the performance of his employment duties and which amount to violation of his duty of loyalty to the company. As a matter of law, such conduct amounts to cause for termination as defined by the Plaintiff's employment agreement.

We therefore find that the trial court did not err in refusing to consider the tape recordings as evidence of plaintiff's alleged breach of duty of loyalty.

### III.

The third issue for review is the question of whether the trial court erred in finding that Boothe was an employee of Fred's through April 9, 2001. The trial court arrived at the April 9, 2001 termination date by counting 90 days from January 9, 2001, the date Boothe received written notice of his termination for cause. Defendant asserts that the Employment Agreement, as drafted, dictates that Boothe's date of termination was November 20, 2000 - Boothe's final "active" day of employment.

"A determination of the parties' written intent in a written contract is a question of law resolved by examining the four corners of the contract and the circumstances at the time of

-23-

contracting." ***BVT Lebanon Shopping Center, Ltd. v. Wal-Mart Stores, Inc.***, 48 S.W.3d 132, 135 (Tenn. Ct. App. 2001) (citing ***Realty Shop, Inc. v. RR Westminster Holding, Inc.***, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999); ***Gredig v. Tenn. Farmers Mut. Ins. Co.***, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994)). In ***Warren v. Metro. Gov't of Nashville & Davidson County***, 955 S.W.2d 618 (Tenn. Ct. App. 1997), we discussed the role of a Court in interpreting a contract:

> Courts are to interpret and enforce the contract as written, according to its plain terms. ***Petty v. Sloan***, 197 Tenn. 630, 277 S.W.2d 355, 358 (1955); ***Home Beneficial Ass'n v. White***, 180 Tenn. 585, 177 S.W.2d 545, 546 (1944). We are precluded from making new contracts for the parties by adding or deleting provisions. ***Cent. Adjustment Bureau, Inc. v. Ingram***, 678 S.W.2d 28, 37 (Tenn. 1984); ***Shell Oil Co. v. Prescott***, 398 F.2d 592 (6th Cir. 1968). When clear contract language reveals the intent of the parties, there is no need to apply rules of construction. An ambiguity does not arise in a contract merely because the parties may differ as to interpretation of certain of its provisions. ***Oman Construction Co. v. Tennessee Valley Auth.***, 486 F. Supp. 375 (M.D. Tenn. 1979). A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one; a strained construction may not be placed on the language used to find an ambiguity where none exists. ***Empress Health and Beauty Spa, Inc. v. Turner***, 503 S.W.2d 188, 190-91 (Tenn. 1973). We are to consider the agreement as a whole in determining whether the meaning of the contract is clear or ambiguous. ***Gredig v. Tenn. Farmers Mut. Ins. Co.***, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994). If a contract is plain and unambiguous, the meaning thereof is a question of law for the court. ***Petty v. Sloan***, 277 S.W.2d at 358.

*Id*. at 622-23.

Section 5(a) of the Employment Agreement states:

> ***This Agreement shall continue unless and until terminated***, (i) with or without cause, by written notice of termination as provided in Section 1 above, (ii) ***by either party for cause, upon not less than ninety (90) days prior written notice to the other*** (except that such notice of termination may be (x) effective immediately in the case of termination by Company for acts of Executive involving moral turpitude or breach of duty of loyalty, or (y) effective in ten (10) days in the case of termination by Executive for cause, or (iii) as otherwise provided herein.

(emphasis added).

Based on our reading of the plain language of the above provision, we find that the trial court did not err in concluding that Boothe's final date of termination was April 9, 2001. The plain language of Section 5(a) provides that Boothe's Employment Agreement "***shall*** continue unless and until terminated ... by either party for cause, upon not less than (90) days ***prior written notice*** to the other." (emphasis added). The evidence is undisputed that Boothe did not receive written notice of his termination until January 9, 2001. Because the plain language of Section 5(a) requires 90 days ***prior*** written notice of termination for cause, we are unable to agree with defendant's proposed termination date of November 20, 2000. Rather, we find that the termination provision of the Employment Agreement was not triggered until Boothe's receipt of written notice of termination on January 9, 2001. Counting 90 days from this date, the trial court correctly set Boothe's termination date as April 9, 2001.

To briefly address defendant's argument that Boothe's "active employment" with Fred's ended November 20, 2000, we note that the mere fact that Boothe ceased having any authority to perform the duties or responsibilities of Chief Operating Officer as of November 20, 2000 does not necessitate a finding that plaintiff's employment was terminated on this date. Section 2 of the Employment Agreement states that the responsibilities assigned to Boothe as Chief Operating Officer are subject "at all times" to the control of the Chief Executive Officer. Therefore, pursuant to this provision, Hayes was empowered to reduce or eliminate Boothe's duties and responsibilities as he saw fit, without terminating employment. For this reason, we find that the mere fact that Boothe's authority to act on behalf of defendant as Chief Operating Officer was revoked on November 20, 2000, is not dispositive of the issue of whether he was an employee of defendant from November 20, 2000 through April 9, 2001.

**IV.**

Fred's next presents several issues for review regarding plaintiff's entitlement to certain compensation and benefits.

### A. Restricted Stock Award Agreement of February 28, 1996

The first related issue is the question of whether the trial court erred in finding that Boothe was "entitled to be granted the shares of stocks and dividends awarded in the Restricted Stock Award Agreement of February 28, 1996."

Introduced as an exhibit at trial, the Restricted Stock Award Agreement ("RSAA") granted to Boothe "a conditional award (the "Award") of 1,750 shares of no par value common stock of the Company (the "Shares"), subject in all respects to the terms, definitions and provisions of this agreement (the "Agreement") and the **1993 LONG-TERM INCENTIVE PLAN** (the "Plan") adopted by the Company which is incorporated herein by reference." (emphasis supplied). Under the terms of the RSAA, the shares granted by the award are deposited with the company until the

restrictions governing the grant expire, lapse, or are removed. The RSAA contains the following pertinent restrictive clauses:

> (b) The Shares shall be forfeited to the Company, and all rights of the Grantee to such Shares shall terminate without any payment, if the Grantee fails to remain continuously as an employee of the Company until the Restrictions lapse for any reason other than (i) Termination Without Cause (as defined), or (ii) by reason of any other circumstances the Committee may, in its discretion, find acceptable.

> (c) As used herein, "Termination Without Cause" shall mean the cessation of the Grantee's employment with the Company for any reason (including, without limitation, by reason of death) other than (i) conviction for a felony, (ii) refusal to perform the duties of the Grantee's employment, (iii) misconduct or negligence in the performance of the duties of the Grantee's employment, or (iv) violation of the Grantee's duty of loyalty to Company.

Fred's 1993 Long-Term Incentive Plan provides in pertinent part:

> (d) <u>Lapse of Restrictions</u>. The restricted stock agreement shall specify the terms and conditions upon which any restriction upon restricted stock awarded under the Plan shall expire, lapse, or be removed, as determined by the Committee. Upon the expiration, lapse, or removal of such restrictions, Shares free of the restrictive legend shall be issued to the grantee of [sic] his legal representative.

Section 2 of the RSAA sets the restriction date on all shares covered by the RSAA as the "fifth anniversary of the date of grant set forth below...." The date of grant is listed in the RSAA as February 28, 1996. Therefore, according to the terms of the RSAA, the restriction period ended, and the restrictions contained therein subsequently lapsed, on February 28, 2001.

Defendant's argument challenging the trial court's award of shares to Boothe pursuant to the RSAA hinges primarily on the assertion that the trial court improperly "superimposed" the termination provisions of Boothe's Employment Agreement onto the RSAA. Specifically, defendant maintains that the trial court erred in applying the April 9, 2001 termination date to the RSAA, where the Employment Agreement neither references nor incorporates the RSAA. On the basis of this argument, defendant contends that the RSAA should be read alone, and not in conjunction with an Employment Agreement executed two years after implementation of the stock award agreement.

We find defendant's argument unpersuasive. First, we note that there is no indication in the Employment Agreement, RSAA, or the 1993 Long-Term Incentive Plan, that an employee's date of

termination, and specifically Boothe's date of termination, is automatically deemed to be the employee's final "active day" of employment. Second, we find that the Employment Agreement expressly governed Boothe's employment, and thus the termination of plaintiff's employment. Neither the RSAA or the 1993 Long-Term Incentive Plan include any provisions regarding the calculation of an employee's termination date. Thus, the trial court correctly relied upon the Employment Agreement in setting plaintiff's termination date.

For the above reasons, we find that the trial court correctly concluded that Boothe was entitled to an award of 4,099 shares of stock pursuant to the Restricted Stock Award dated February 28, 1996, and to "the dividends from the 4,099 shares of stock from the Restricted Stock Award dated February 28, 1996 through the entry of this Order and is awarded judgment in the total amount of $737.82, and such additional dividends as may accrue."

### *B. Incentive Stock Option Agreement of March 2, 2000*

Fred's next asserts that the trial court erred in finding that Boothe was entitled to "exercise an option to purchase one-third of the shares granted in the Incentive Stock Option Agreement of March 2, 2000." Defendant specifically objects to the trial court's award on the following grounds: (1) Boothe was not an employee of Fred's on March 2, 2001 as required by the Incentive Stock Option Agreement ("ISO"); (2) Boothe did not achieve his personal plan for fiscal year 2000; and (3) Boothe was terminated "for cause," warranting immediate termination pursuant to the terms of the ISO.

Under the ISO, Boothe was granted an option to "purchase a total of 13,000 shares of no par value Class A common stock of the Company (the "Shares"), at the price determined as provided herein, and in all respects subject to the terms, definitions and provisions of the **1993 LONG-TERM INCENTIVE PLAN** (the "Plan")...." (emphasis supplied). The ISO set the option price as $15.00 per share, and mandated that the option to purchase shall be exercisable pursuant to the following conditions:

> 4. <u>Extent of Exercise</u>. This Option shall be exercisable to the extent of 1/3 of the Shares covered hereby on or after March 2, 2001 if the Grantee is still employed by the Company and has achieved his/her plan for the fiscal year and if the Company earned for its fiscal year net income per share (as reported in the Company's audited consolidated statements of income) of at least $1.16....

Section 5 of the ISO contains the following restrictions on exercise:

> 5. <u>Restrictions on Exercise</u>. This Option may not be exercised if the issuance of such Shares upon such exercise would constitute a violation of any applicable federal or state securities laws or other law or regulation. Further, this Option may not be exercised if the

Optionee has been terminated by the Company for any "Termination For Cause" reasons which include but are not limited to (i) conviction of a felony, (ii) refusal to perform the duties of the Optionee's employment, (iii) misconduct or negligence in the performance of the duties of the Optionee's employment, (iv) violation of the Optionee's duty of loyalty to the Company, or etc...

Section 13 of the ISO sets forth the defendant's rights with regard to termination of employment under this stock agreement:

13. <u>Rights to Terminate Employment</u>. Nothing in the Plan or in this Agreement shall confer upon any person the right to continue in the employment of the Company or affect any right which the Company may have to terminate the employment of such person except as follows:

***(a) The Company covenants with the Optionee that any termination of the Optionee's employment by the Company shall require one (1) month's notice by the Company to the Optionee except in cases of "For Cause" termination which will result in immediate termination.***

(emphasis added).

The trial court specifically held that Boothe was "entitled to exercise the Incentive Stock Option Agreement granted March 2, 2000 to purchase the first one-third of the shares awarded up to a total of 8,124 shares at the exercise price of $7.92 per share." Based on our reading of the plain language of Sections 4, 5, and 13 of the ISO, we find that the trial court erred in concluding that Boothe was entitled to exercise his option to purchase the first one-third of shares granted by the ISO. Unlike the RSAA and the Employment Agreement, the ISO explicitly provides that "for cause" termination will result in immediate termination of the employee. Under the ISO, no notice is required where an employee is terminated for cause. Therefore, for purposes of the ISO only, Boothe's date of termination would be calculated as November 20, 2000. For this reason, we find that Boothe was not an employee of Fred's under the ISO on March 2, 2001, and therefore not entitled to exercise his option pursuant to this agreement.

### C. Salary and COBRA Insurance Premiums

The next issue presented for review is the question of whether the trial court erred in "concluding that [Boothe] was entitled to payment of salary and reimbursement of COBRA insurance premiums through April 9, 2001."

Section 3 of the Employment Agreement governed Boothe's compensation and benefits package as Chief Operating Officer, providing:

As compensation for all of the services to be performed hereunder, Company agrees to pay and Executive agrees to accept an annual base salary of $120,000, which shall be reviewed annually and shall be subject to upward adjustment from the aforesaid level at the discretion of the Board of Directors of Company.... Company will make available to Executive such benefits on the same terms as are or shall be granted or made available by Company to its other executive employees, to the extent that Executive shall become qualified or eligible for such employee benefits....

Under Section 5(c):

If, during any term of this Agreement, Company terminates this Agreement for any reason, or Executive terminates this Agreement, retires or dies, whether at or prior to the end of the Initial or any Additional Term, then and in that event, the sole payments to which Executive, his heirs, legatees and legal representatives shall be entitled shall be payment to Executive of the compensation herein provided (i.e., base salary and any minimum bonus) prorated to the date of such termination, and thereafter Company shall have no further obligations or liabilities hereunder, except as provided in subsection (d) below as to certain terminations hereunder.

Section 5(d) provides that pay and benefits will not be extended past the date of termination for executives terminated for cause.

As ruled, with respect to the Employment Agreement, Boothe remained an employee of Fred's through April 9, 2001. Therefore, in accordance with Section 5(c) we find that the trial court correctly held that Boothe was entitled to payment of his salary prorated to the date of termination, April 9, 2001.

With regard to Boothe's entitlement to reimbursement of COBRA premiums paid from November 2000 through April 9, 2001, we find that Section 3 of the Employment Agreement entitled Boothe to insurance benefits for the life of his employment with Fred's, so long as he met the qualifications for such benefits. The crux of defendant's objection is that Boothe was not qualified to receive insurance benefits because he ceased being an employee as of November 20, 2000. However, because we have already found that Boothe was an employee of Fred's until April 9, 2001, we find that plaintiff is entitled to reimbursement for all COBRA premiums paid from November 2000 through April 9, 2001.

### D. Annual Salary Bonus

Defendant's final issue on appeal is the question of whether the trial court erred in "concluding that [Boothe] was entitled to a salary bonus of $52,000.00 for his work performance during the year 2000." Defendant's specifically objects to the trial court's award as "inconsistent," noting that it was illogical for the court to reward plaintiff with payment of a full salary bonus for a performance year that led to his termination "for cause," especially in light of the fact that Hayes cut his own bonus by roughly eighty percent for his role in the company's shrinkage problem.

Section 3 of the Employment Agreement provides that Boothe shall be paid a minimum bonus of $20,000.00 for the first three twelve-month periods under the agreement. After the expiration of the initial three-year period, the Employment Agreement dictates that Boothe shall be considered for bonus awards on the same basis as other executives.

In March 2000, Fred's introduced the 2003 Key Employee Incentive Plan ("Incentive Plan"). Boothe was selected as a participant in this plan. The trial court found that, as a participant, Boothe was entitled to a "separate bonus pursuant to [the Incentive Plan,] in lieu of the minimum annual bonus of $20,000 set forth in the Employment Agreement of Edwin Boothe." Under the Incentive Plan, bonuses were awarded for fiscal year 2000 only if Fred's met its corporate goal of $1.16 earnings per share ("EPS") for the year. Boothe was awarded 26 bonus pool plan points for fiscal year 2000. In March 2000, these points were valued at approximately $2,000.00 per point, for a total of $52,000.00.

In its Findings of Fact and Conclusions of Law, the trial court determined that Fred's achieved its corporate goal of $1.16 EPS for fiscal year 2000, thereby entitling Boothe to 26 bonus pool plan "points," and a subsequent bonus of $52,000. To determine whether the trial court properly awarded this bonus, we must consider (1) whether the company achieved its corporate goal of $1.16 EPS for 2000, and (2) whether Boothe's individual conduct or performance as Chief Operating Officer in fiscal year 2000 has any bearing on his right to collect an annual bonus under the Incentive Plan.

Addressing first the question of whether Fred's achieved its corporate goal of $1.16 EPS, we note that the Incentive Plan Memo distributed to Boothe identifies the company's goal as $1.16 EPS. According to defendant's Consolidated Statement of Income for fiscal year 2000, the company met its corporate goal of $1.16 EPS.

Having determined that Fred's achieved its corporate EPS goal for fiscal year 2000, we must now determine whether Boothe's negligent conduct and performance during fiscal year 2000 prohibits plaintiff from collecting his year end bonus pursuant to the Incentive Plan or, in the alternative, reduces the amount of bonus to which Boothe is entitled. Under the Incentive Plan, a participant's options do not vest unless the company meets its corporate EPS goals. In addition to corporate EPS goals, the following individual vesting conditions must be met:

1. Employed
2. Meet Initial Budget and Goals

3. 60% fixed and 40% subject to recognition, by the manager, that all other responsibilities were carried out in a timely and successful manner.

As has been discussed, Boothe was an employee of Fred's for the entire fiscal year 2000, ending in February 2000. With regard to the second condition listed above, the evidence is undisputed that Fred's exceeded its shrinkage budget for fiscal year 2000. As Chief Operating Officer, Boothe was charged with monitoring this budget. Therefore, responsibility for failing to stay within the confines of the shrinkage budget falls, at least in part, on Boothe's shoulders. There is some dispute as to whether Boothe met his individual goals for fiscal year 2000 - a dispute that hinges on the question of whether Boothe's individual goals were the same as the company's overall goals. However, having found that Boothe failed to meet the initial shrinkage budget, we need not address the question of whether Boothe met individual goals for fiscal year 2000.

In finding that Boothe failed to perform in compliance with the initial shrinkage budget, and in recognition of the trial court's decision to uphold Boothe's termination for cause on the grounds of negligent conduct and performance, we are inclined to agree with defendant's assertion that Boothe was not entitled to collect his annual bonus. We therefore vacate the portion of the trial court's Order on Judgment awarding plaintiff his bonus for fiscal year 2000 pursuant to the Incentive Plan.

## V.

Boothe presents for review the additional issue of whether the trial court erred in denying plaintiff an award of attorney's fees.

Section 9 of Boothe's Employment Agreement states, in pertinent part:

In the event it should become necessary for either party to initiate any suit or proceeding to enforce the terms of this Agreement, the party adjudged to be in breach shall pay all costs and expenses thereof, including reasonable attorneys' fees.

Applying Section 9 to the facts and circumstances of the case at bar, we find that the trial court properly denied Boothe's claim for attorney's fees on the basis that both parties breached the Employment Agreement. With regard to Fred's, we find that the defendant breached the terms of the agreement by making no salary payments and providing no health benefits to plaintiff from November 20, 2000 through April 9, 2001, despite defendant's admitted failure to provide contractually-required notice of termination. Boothe, in contrast, breached the Employment Agreement by failing to comply with Section 2 of the agreement, which provides:

As COO, Executive shall have and agrees to assume primary responsibility (subject at all times to the control of the Chief Executive Officer of the Company) for matters assigned to him by the Chief Executive Officer. In the performance of such duties, Executive agrees to make available to Company all of his professional and managerial knowledge and skill and all of his gainful time in order to properly fulfill his duties.

The trial court's finding that defendant properly terminated Boothe for cause on the basis of plaintiff's "negligence in the performance of the duties of his employment," supports our conclusion that plaintiff failed to comply with Section 2 quoted above, and thereby breached his Employment Agreement with Fred's. For these reasons, we find that the trial court properly denied Boothe's claim for attorney's fees.

The dissent notes that Fred's did not give Boothe the contractually-provided ninety-day written notice but instead verbally terminated him on November 20, 2000. As the record reflects, Fred's, by written notice to Boothe dated January 8, 2001, confirmed Boothe's termination, apparently attempting to comply with the provisions of the contract. The dissent points out that Fred's actions effectively terminated Boothe's employment on November 20, 2000, although this termination constituted a breach of the contract.

The clear provisions of the contract require ninety days written notice for termination for cause, and we believe that this provision should govern the effective termination date of the contract. In any event, the dispute concerning the effective date of termination, under the circumstances of this case, does not change the result reached by the Court. If Fred's breached the contract as to the notice provision, Boothe is entitled to all damages that are normal and foreseeable resulting from the breach of the contract. *See Moore Const. Co., Inc. v. Clarksville Dep't. of Electricity*, 707 S.W.2d 1, 14 (Tenn. Ct. App. 1985) (*aff'd*, Supreme Court March 24, 1986). Fred's is not entitled to breach the contract and then foreclose Boothe's right to all the benefits that would accrue to him in the absence of such a breach.

## VI.

In sum, the trial court's judgment allowing plaintiff to purchase shares of defendant's stock pursuant to the Incentive Stock Option Agreement is reversed, and the trial court's judgment awarding plaintiff $52,000.00 bonus is also reversed. The judgment in all other respects is affirmed. Costs of the appeal are assessed one-half to plaintiff, Edwin Boothe, and one-half to defendant, Fred's, Inc., and its surety. The case is remanded for such further proceedings as are necessary.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.